299 F.3d 748
 Joshua DAVEY, Plaintiff-Appellant,
v.
Gary LOCKE, Gov., individually and in his official capacity; Marcus S. Gaspard, individually, and in his official capacity as Executive Director of the Higher Education Coordinating Board; Bob Craves, individually, and in his official capacity as Chair of the Higher Education Coordinating Board; John Klacik, individually, and in his official capacity as Associate Director of the Higher Education Coordinating Board, Defendants-Appellees.
 No. 00-35962.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 6, 2002.
 Filed July 18, 2002.
 
 Stuart J. Roth, The American Center for Law and Justice, Mobile, Alabama, and Kevin H. Theriot, The American Center for Law and Justice, Virginia Beach, VA, for the plaintiff-appellant.
 Michael J. Shinn, Assistant Attorney General, Seattle, WA, for the defendants-appellees.
 Appeal from the United States District Court for the Western District of Washington; Barbara J. Rothstein, Chief District Judge, Presiding. D.C. No. CV-00-00061-BJR.
 Before: RYMER, McKEOWN, and GOULD, Circuit Judges.
 RYMER, Circuit Judge.
 
 
 1
 This appeal challenges Washington law that denies a statefunded "Promise Scholarship" to students who are qualified for it by virtue of high school grades, family income, and attendance at an accredited college in the state, solely because the student decides to pursue a degree in theology.
 
 
 2
 Joshua Davey was awarded the Scholarship but lost it when he declared a major in Pastoral Ministries at Northwest College. He claims that this was discriminatory and denied him access to funds that were otherwise available to all eligible students in violation of the religion clauses of the First Amendment and his federal and state constitutional rights to freedom of speech and equal protection. Washington's Higher Education Coordinating Board (HECB), which administers the Promise Scholarship, defends its action on the ground that the state did not prohibit Davey from pursuing religious studies but simply declined to fund them; that state funding for Davey's religious instruction is barred by state law, Wash. Rev.Code § 28B.10.814,[1] and the state constitution's provision regarding the separation of church and state;[2] and that refusing to award aid to students pursuing a degree in theology is reasonably related to the bar in the Washington Constitution.
 
 
 3
 We conclude that HECB's policy lacks neutrality on its face. It makes the Promise Scholarship (which is neutral toward religion) available to all students who meet generally applicable criteria, except for those who choose a religious major. As this classification facially discriminates on the basis of religion, it must survive strict scrutiny. We are not persuaded that it does; Washington's interest in avoiding conflict with its own constitutional constraint against applying money to religious instruction is not a compelling reason to withhold scholarship funds for a college education from an eligible student just because he personally decides to pursue a degree in theology. Accordingly, we hold that HECB impermissibly deprived Davey of his scholarship.
 
 
 4
 * In 1999, Washington created a new college scholarship program for low and middle income students who achieve an excellent academic record throughout their high school careers. The award is known as a "Promise Scholarship." It is available for the first year of a student's postsecondary education, and may be renewed for one additional year. The Scholarship was worth $1,125 for the year 1999-2000, and $1,542 for 2000-01. Private school students may spend their funds on any education-related expense, including room and board.
 
 
 5
 The Washington Higher Education Coordinating Board administers the Promise Scholarship. Its overview announcing the program stated:
 
 
 6
 To be eligible you must meet these criteria:
 
 
 7
 1. Be designated by your high school as in the top 10% of the 1999 graduating senior class.
 
 
 8
 2. Have a family income that is equal to or less than 135% of the state's median.
 
 
 9
 3. Attend an accredited public or private university, college or other accredited post-secondary institution in the state of Washington.
 
 
 10
 Davey applied for the Scholarship and was selected as a Washington Promise Scholarship recipient in August 1999. In the fall he enrolled at Northwest College, an accredited institution affiliated with the Assembly of God. Students applying to Northwest are required to indicate "a personal commitment to Jesus Christ as Lord and Savior," and the college educates students from a "distinctly Christian" point of view.
 
 
 11
 As he is a Christian who intends to become a cleric, Davey declared a double major in Pastoral Ministries and Business Management and Administration. Davey wanted to go to college, and to pursue this major, because of his religious beliefs. A Pastoral Ministries major at Northwest is designed to prepare students for a career as a Christian minister. Classes are taught from a viewpoint that the Bible represents truth and is foundational whereas, according to HECB, theology courses at public postsecondary institutions in Washington are taught from an historical and scholarly point of view.
 
 
 12
 On October 12, 1999 HECB notified financial aid administrators throughout the state that students pursuing a degree in theology are not eligible to receive the Washington Promise Scholarship.[3] Northwest determined that majors in Pastoral Ministries are pursuing a degree in theology, so it could not certify Davey's eligibility as HECB required. As a result, Davey had to choose whether to follow his calling, or forego the Scholarship. He decided to give up the Scholarship, but has been able to pursue his major.
 
 
 13
 Davey brought this action against the Governor and officials of HECB[4] to enjoin HECB from refusing to award the Scholarship to an otherwise eligible student solely because the student is pursuing a degree in theology, and for damages. He and HECB agreed to escrow Scholarship funds for the 2000-01 school year. Both parties moved for summary judgment, which the district court granted in HECB's favor.
 
 
 14
 Davey timely appealed.
 
 II
 
 15
 * The parties analyze the authorities from every possible angle. Their arguments distill to this:
 
 
 16
 On the one hand, singling Davey out for unfavorable treatment in an otherwise neutral program on account of a religious major violates the free exercise rule of Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), as well as the rule of McDaniel v. Paty, 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978), that a state offering a benefit may not impose a disability on the basis of religious status. Thus, Washington's restriction may not stand unless it is narrowly tailored to advance a compelling state interest.
 
 
 17
 On the other hand, declining to subsidize the exercise of a constitutional right is permissible under Rust v. Sullivan, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), and Regan v. Taxation With Representation of Wash., 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983). The focus in free exercise inquiries is on what the government prohibits rather than on what the individual can exact. Lyng v. Northwest Indian Cemetery Protective Ass'n., 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988). Here, Washington simply refuses to underwrite the education of students who pursue a degree in theology, but does not prohibit Davey from freely practicing or pursuing his religious views, speaking about them, or associating with others of like mind. Accordingly, strict scrutiny is inapplicable.
 
 
 18
 The rejoinder is that Regan and Rust do not apply because the programs there were set up for the government's own purposes as a speaker. As a speaker, the government may selectively fund a program to encourage activities that it believes are in the public interest. By contrast, the purpose of the Promise Scholarship program is broad: to fund the educational pursuits of outstanding students. For this reason, administration of the Scholarship must be viewpoint neutral under Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). However, it isn't, because state policy excludes only those recipients who pursue the study of theology from a religious perspective.
 
 
 19
 We recur to basic principles. The First Amendment declares: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." Thus, the state may neither favor, nor disfavor, religion. A law targeting religious beliefs as such is never permissible. In McDaniel, for example, the Court held that a state law that disqualified members of the clergy from being delegates to a constitutional convention violated a minister's right to the free exercise of his religion. 435 U.S. at 629, 98 S.Ct. 1322. As the Supreme Court explained in Lukumi, "[a]t a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." 508 U.S. at 532, 113 S.Ct. 2217.
 
 
 20
 The Free Exercise Clause "protect[s] religious observers against unequal treatment." Lukumi, 508 U.S. at 542, 113 S.Ct. 2217 (quoting Hobbie v. Unemployment Appeals Comm'n of Fla., 480 U.S. 136, 148, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987) (Stevens, J., concurring in judgment)). Whereas a law that is neutral and of general applicability need not be justified by a compelling government interest even if it has the incidental effect of burdening a religious practice, a "law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny. To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." Lukumi, 508 U.S. at 546, 113 S.Ct. 2217 (quoting McDaniel, 435 U.S. at 628, 98 S.Ct. 1322, quoting Wisconsin v. Yoder, 406 U.S. 205, 215, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (quotation marks omitted)); Employment Division, Dep't of Human Resources of Oregon v. Smith, 494 U.S. 872, 888, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).
 
 
 21
 Davey submits that HECB's policy fails Lukumi's neutrality test because the policy discriminates on its face by treating those who choose a religious major unequally. HECB does not dispute that Davey declared his major for religious reasons or that doing so is constitutionally protected; rather, in its view, Lukumi does not control because unlike the ordinances at issue there, Wash. Rev. Code § 28B.10.814 does not proscribe pursuing a degree in theology or bar only religiously motivated pursuits. The object of the ordinances invalidated in Lukumi was suppression of a central practice of Santeria worship, the ritualistic slaughter of animals. As HECB points out, Wash. Rev. Code § 28B.10.814 neither prohibits religious conduct nor does its application turn on the student's religious motivation. In this respect we agree with HECB that the Washington statute differs from the Lukumi ordinances.
 
 
 22
 However, Wash. Rev.Code § 28B.10.814 nevertheless implicates the free exercise interests articulated in Lukumi. Both the statute and HECB's implementing policy refer on their face to religion. The Promise Scholarship program is administered so as to disqualify only students who pursue a degree in theology from receiving its benefit; otherwise the Scholarship is available to all secondary school graduates who have high enough grades, low enough income, and attend an accredited college in the state. And the policy as applied excludes only those students who declare a major in theology that is taught from a religious perspective.
 
 
 23
 HECB's policy also lacks neutrality for the same reason that Tennessee's disqualification of ministers from public office, invalidated in McDaniel, lacked neutrality. "Minister[s] of the Gospel or priest[s] of any denomination" were barred by statute from serving as delegates to the state's constitutional convention. McDaniel, who was an ordained Baptist minister, wanted to be a delegate but the state supreme court held that the state's interest in preventing establishment of religion outweighed the guarantee of the Free Exercise Clause. The United States Supreme Court reversed. It made clear that the right to the free exercise of religion encompasses the right to be a minister, and that the clergy disqualification statute imposed an impermissible disability on the basis of religion because McDaniel could not exercise his right to be a minister and to hold office at the same time. McDaniel, 435 U.S. at 626, 98 S.Ct. 1322; see Lukumi, 508 U.S. at 533, 113 S.Ct. 2217 (opinion of Kennedy, J.) (citing McDaniel as rare case where law discriminates on the basis of religious status); id. at 557, 113 S.Ct. 2217 (Scalia, J., concurring) (observing that a law excluding members of religious organization from public benefits lacks neutrality, noting McDaniel).
 
 
 24
 HECB distinguishes McDaniel on the footing that McDaniel was prohibited from being a delegate as a result of being a minister, whereas Wash. Rev.Code § 28B.10.814 does not prohibit Davey from pursuing a degree in theology. But this misses the point of McDaniel: A state law may not offer a benefit to all (there, to hold a public position; here, to hold a Promise Scholarship), but exclude some on the basis of religion (there, ministers; here, would-be ministers). Washington's restriction disables students majoring in theology from the benefit of receiving the Scholarship just as Tennessee's classification disabled ministers from the benefit of being a delegate. A minister could not be both a minister and a delegate in Tennessee any more than Davey can be both a student pursuing a degree in theology and a Promise Scholar in Washington. As the Court explained,
 
 
 25
 [u]nder the clergy-disqualification provision, McDaniel cannot exercise both rights simultaneously because the State has conditioned the exercise of one on the surrender of the other.... In so doing, Tennessee has encroached upon McDaniel's right to the free exercise of religion. "[T]o condition the availability of benefits [including access to the ballot] upon this appellant's willingness to violate a cardinal principle of [his] religious faith [by surrendering his religiously impelled ministry] effectively penalizes the free exercise of [his] constitutional liberties." Sherbert v. Verner, 374 U.S. 398, 406, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965 (1963).
 
 
 26
 McDaniel, 435 U.S. at 626, 98 S.Ct. 1322. The same is true here. Even though Davey (like McDaniel) was not forced to forego his religious calling, Davey's eligibility for the Scholarship, like McDaniel's eligibility for office, was conditioned on giving up his religious pursuit.[5]
 
 
 27
 HECB asserts that Davey's reliance on McDaniel is also inapposite because it presumes a right to state funding for his religious exercise. HECB submits that the state has no obligation to underwrite Davey's pursuit of a religious degree, or to make it less costly, relying primarily on Regan and Rust. This is undoubtedly true in the abstract. Regan and Rust stand for the proposition that the government, as speaker or policy-maker, may selectively sponsor or pay for programs that it believes to be in the public interest, without being obliged to fund or encourage an alternative activity.[6] In Regan, the Court upheld denial of a tax exemption (the equivalent of a subsidy) for lobbying activities of non-profit welfare organizations because it reflected a policy decision to subsidize such organizations generally and to give an extra subsidy to those that did not engage in lobbying. In Rust, the Court upheld regulations that limited the ability of recipients of federal grants for family-planning services to engage in abortion-related advice and activities. See also Harris v. McRae, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (holding that the government has no affirmative constitutional obligation to ensure that persons have the financial resources to exercise a constitutional right, there of obtaining an abortion). Even so, as the Court states in Regan, the government may not deny a benefit to a person because he exercises a constitutional right, 461 U.S. at 545, 103 S.Ct. 1997; and "[t]he case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to `aim [ ] at the suppression of dangerous ideas.'" Id. at 548, 103 S.Ct. 1997 (quoting Cammarano v. United States, 358 U.S. 498, 513, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959), quoting Speiser v. Randall, 357 U.S. 513, 519, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958)). This is what makes this case different from Rust and Regan, as McDaniel and Rosenberger indicate.
 
 
 28
 In Rosenberger, the University authorized payment of out-side contractors for the printing costs of student publications through a Student Activities Fund, except that costs of religious activity (in connection with publications otherwise eligible for funding) would not be reimbursed. The Court distinguished this practice from the principle recognized in Rust and Regan:
 
 
 29
 Although acknowledging that the Government is not required to subsidize the exercise of fundamental rights, we reaffirmed the requirement of viewpoint neutrality in the Government's provision of financial benefits by observing that "[t]he case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to `ai[m] at the suppression of dangerous ideas.'" Regan relied on a distinction based on preferential treatment of certain speakers — veterans' organizations — and not a distinction based on the content or messages of those groups' speech. The University's regulation now before us, however, has a speech-based restriction as its sole rationale and operative principle.
 
 
 30
 Rosenberger, 515 U.S. at 834, 115 S.Ct. 2510 (citations omitted). Thus, a restriction based on religion is aimed at "suppression of dangerous ideas." And "ideologically driven attempts to suppress a particular point of view are presumptively unconstitutional in funding, as in other contexts." Id. at 830, 115 S.Ct. 2510. Therefore, once the state of Washington decided to provide Promise Scholarships to all students who meet objective criteria, it had to make the financial benefit available on a viewpoint neutral basis.
 
 
 31
 HECB dismisses Rosenberger because the University's program there involved expressive conduct. In its view, Davey's claims do not involve public funds designated for expressive conduct, and Wash. Rev.Code § 28B.10.814 does not aim at the suppression of ideas through refusal to underwrite those ideas. We do not believe Rosenberger can be distinguished so readily. While the funding in Rosenberger did involve student publications (except for religious publications), funding students' education (except for students pursuing religious education) is not much different. Expressive conduct, creative inquiry, and the free exchange of ideas are what the educational enterprise is all about. So is pursuing a course of study of one's own choice. As the Court in Rosenberger observed, "[f]or the University, by regulation, to cast disapproval on particular viewpoints of its students risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses." Id. at 836, 115 S.Ct. 2510; cf. Rust, 500 U.S. at 199-200, 111 S.Ct. 1759 (the university is a traditional sphere of free expression that is fundamental to the functioning of our society). The disfavored viewpoint in Rosenberger was religion, as it is here, and the risk from state disapproval of the religious pursuits of its students is the same. In any event, to the extent that Rosenberger's rationale turns on the Court's treatment of funds as a limited public forum, the Court subsequently indicated in Legal Services Corp. v. Velazquez, 531 U.S. 533, 544, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001),[7] that limited forum cases such as Rosenberger, Lamb's Chapel v. Ctr. Moriches Union Free School District, 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993), and Perry Education Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), are instructive in subsidy cases as well. The bottom line is that the government may limit the scope of a program that it will fund, but once it opens a neutral "forum" (fiscal or physical), with secular criteria, the benefits may not be denied on account of religion. See also Good News Club v. Milford Cent. Sch., 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001).
 
 
 32
 Wash. Rev.Code § 28B.10.814 is viewpoint based, and because its viewpoint is based on religion, it does discriminate against religious ideas. The Promise Scholarship program itself has a neutral purpose and is based on objective criteria. For example, the Washington legislature declared that "it regards the higher education of its qualified domiciliaries to be a public purpose of great importance to the welfare and security of this state and nation," and that "the benefit to the state [from a student financial aid program] in assuring the development of the talents of its qualified domiciliaries will bring tangible benefits to the state in the future." Wash. Rev.Code § 28B.10.800 (Notes). The Governor's congratulatory letter to Davey on his selection as a Washington Promise Scholarship recipient states that "[e]ducation is the great equalizer in our society. Regardless of gender, race, ethnicity, or income, a quality education places all of us on a more level playing field." The selection criteria are high school grades, income, and staying in Washington for college; the de selection criterion is pursuing a degree in theology. This has nothing to do with the purpose or point of the program. To the extent that the message behind the Promise Scholarship is that doing well in high school pays off, and that going to college in Washington is a good thing, and that developing the talents of promising students is of great importance to the state, it is qualified with the message "unless the student pursues a degree in theology from a religious perspective." This necessarily communicates disfavor, and discriminates in distributing the subsidy in such a way as to suppress a religious point of view.
 
 
 33
 Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988), says nothing to the contrary. HECB particularly relies on language in the opinion emphasizing that "[t]he crucial word in the constitutional text [of the Free Exercise Clause] is `prohibit': `For the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government.'" Id. at 451, 108 S.Ct. 1319 (quoting Sherbert, 374 U.S. at 412, 83 S.Ct. 1790 (Douglas, J., concurring)). While of course this is what the Clause says, "[w]hat the First Amendment precludes the government from commanding directly, it also precludes the government from accomplishing indirectly." Rutan v. Republican Party of Illinois, 497 U.S. 62, 77-78, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (citing Speiser, 357 U.S. at 526, 78 S.Ct. 1332). More importantly, Lyng sheds no light on whether the government may except from a neutral program that benefits all who meet secular criteria only those who will use the benefit for a religious reason. The question in Lyng was whether the Free Exercise Clause prohibits the government from permitting timber harvesting in a national forest that had traditionally been used by members of American Indian tribes for religious purposes. The answer is no, essentially because the government's program was neutral and merely had an incidental effect on the tribes' religious experience with no tendency to coerce individuals into acting contrary to their religious beliefs. Lyng, 485 U.S. at 450-51, 108 S.Ct. 1319; see also Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (no religious exception to drug law of general applicability); Bowen v. Roy, 476 U.S. 693, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986) (no religious exemption from social security numbers). This is different from being directly disabled from participating in a government program on the basis of religion, a question that was addressed and resolved in McDaniel and Rosenberger.
 
 
 34
 It is also the case that here, like McDaniel and unlike Rust, Regan or Lyng, the classification is coercive. Grantees in the Rust line of cases could have their cake and eat it, too; that is, they could accept the grant and use it for the program's restricted purpose, yet remain free to tap non-government resources for non-favored activities which could then be conducted independently. Davey cannot. If he accepts the Scholarship, he may not pursue a degree in theology (whether or not he has non-government funds to do so). If he pursues a degree in theology, he gets no Scholarship. Cf. Federal Communications Comm'n. v. League of Women Voters of California, 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984) (Regan not controlling because station subject to limit on editorializing in use of grant funds could not use even private funds to finance editorial activities); Phan v. Virginia, 806 F.2d 516, 520 (4th Cir.1986) (Virginia's refusal to fund attendance at an out-of-state religious college did not violate the Free Exercise Clause because the condition did not force Phan to choose between religious study and financial aid as in-state church-affiliated colleges with facilities to accommodate him were available). See also Peter v. Wedl, 155 F.3d 992, 996 (8th Cir. 1998) (failure to provide spastic quadriplegic student at a religious school with paraprofessional forced choice between foregoing sectarian education or paying for paraprofessional; "[g]overnment discrimination based on religion violates the Free Exercise Clause of the First Amendment").
 
 
 35
 In sum, Wash. Rev.Code § 28B.10.814 and HECB's policy on their face discriminate based on religious pursuit. That the effect of the classification is not to underwrite Davey's education because it includes a degree in theology does not make the classification less of a discrimination on account of viewpoint. This is not a case where a person claims that denial of a financial benefit which is not available to others deprives him of his free exercise rights. Davey was denied a Promise Scholarship to which he was otherwise entitled solely because he personally chose to pursue a religious major. For this reason we must strictly scrutinize the restriction. See McDaniel, 435 U.S. at 628, 98 S.Ct. 1322; Lukumi, 508 U.S. at 546, 113 S.Ct. 2217.
 
 B
 
 36
 HECB contends that even if, contrary to its view, a compelling interest is required, Washington's interest in not violating its own law suffices. In support, it notes that the Washington Supreme Court, and the highest courts of other states, have relied on the establishment clause in their state constitutions to reject claims that a bar on funding religious exercise violates the First Amendment.
 
 
 37
 In particular, HECB points out that the Washington Supreme Court rejected a free exercise claim quite similar to Davey's in Witters v. State Comm'n for the Blind (Witters III), 112 Wash.2d 363, 771 P.2d 1119 (1989) (on remand from Witters v. Washington Dep't of Servs. for the Blind (Witters II), 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986)). The Witters litigation involved a decision by the Washington Commission for the Blind to deny vocational rehabilitation assistance to a blind person who was studying at a Christian college and seeking to become a pastor. The Commission's decision was based on the Washington constitutional prohibition on use of public funds to assist an individual in the pursuit of a career or degree in theology. It was upheld by the Washington Supreme Court, Witters v. State Comm'n for the Blind (Witters I), 102 Wash.2d 624, 689 P.2d 53 (1984), but the United States Supreme Court held that extension of aid to finance a person's training at a Christian college did not violate the Establishment Clause of the First Amendment. The Court left it to the state court to consider the dictates of the Washington Constitution, which Witters I had characterized as "far stricter" than the federal analogue, and the Court declined to "leapfrog" consideration of those issues by holding that the Free Exercise Clause requires Washington to extend aid regardless of what the state constitution commands. Witters II, 474 U.S. at 489. On remand, the Washington Supreme Court held that extending aid would violate the Washington Constitution's prohibition on appropriating and applying public funds to religious instruction, and would not infringe the applicant's right to the free exercise of religion. Davey questions whether this continues to be good law, as the state supreme court has since relied on the dissent in Witters III in upholding state funding for religious worship so long as it passes through private hands first. Malyon v. Pierce County, 131 Wash.2d 779, 935 P.2d 1272 (1997). However, we assume that the Washington Supreme Court's view of the Washington establishment clause is less accommodating than the United States Supreme Court's view of the federal Establishment Clause. The real issue is whether that interest, no matter how stringently construed, is compelling enough to outweigh a credible free exercise challenge under the federal Constitution.[8]
 
 
 38
 Following the Supreme Court's lead in Widmar v. Vincent, 454 U.S. 263, 276, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), we indicated in Kreisner v. City of San Diego, 1 F.3d 775, 779 n. 2 (9th Cir.1993), that a state's broader prohibition on governmental establishment of religion is limited by the Free Exercise Clause of the federal constitution. In Widmar, the University of Missouri claimed a compelling interest in complying with the establishment provisions of the Missouri Constitution to justify exclusion of a student religious group from use of campus facilities. The Court declined to decide whether a state interest derived from its own constitution could ever outweigh the free speech interests protected by the First Amendment, but observed that "the state interest asserted here — in achieving greater separation of church and State than is already ensured under the Establishment Clause of the Federal Constitution — is limited by the Free Exercise Clause and in this case by the Free Speech Clause as well. In this constitutional context, we are unable to recognize the State's interest as sufficiently `compelling' to justify content-based discrimination against respondents' religious speech." Widmar, 454 U.S. at 276, 102 S.Ct. 269. HECB submits that Widmar applies only to speech restrictions in an open public forum, but there is little reason to suppose that what fails to justify the violation of one right somehow permits violation of a different right. Indeed, the Court also found that Tennessee's interest in preventing the establishment of religion did not justify that state's restriction on ministers. McDaniel, 435 U.S. at 628-29, 98 S.Ct. 1322. See also Good News Club, 533 U.S. at 113, 121 S.Ct. 2093 (rejecting federal Establishment Clause defense); Lamb's Chapel, 508 U.S. at 395, 113 S.Ct. 2141 (same).
 
 
 39
 The cases upon which HECB relies do not persuade us otherwise. They indicate that states may rely on their own (or the federal) establishment clause if there is no free exercise problem. See, e.g., Luetkemeyer v. Kaufmann, 364 F.Supp. 376 (W.D.Mo.1973), aff'd, 419 U.S. 888, 95 S.Ct. 167, 42 L.Ed.2d 134 (1974) (mem.opinion) (concluding before Widmar that Missouri's interest in the separation of church and state was a compelling state interest that took care of any possible infringement of the Free Exercise Clause); Strout v. Albanese, 178 F.3d 57 (1st Cir. 1999) (finding no free exercise violation and indicating that Maine's policy of excluding private sectarian schools from grants paid directly to schools was the sort of imbroglio that the Establishment Clause was meant to avoid); KDM v. Reedsport Sch. Dist., 196 F.3d 1046, 1051 (9th Cir. 1999) (holding in accord with Strout's free exercise analysis that school district's accommodation of child with disability did not reflect a purpose to suppress religious conduct).
 
 
 40
 We have concluded that in this case there is a free exercise problem. This leaves us with Washington's indisputably strong interest in not appropriating or applying money to religious instruction as mandated by its constitution, and Davey's interest in a Scholarship to which he was entitled based on the objective criteria the state set for qualification — but from which he was disabled based on his being a theology major. We believe that Washington's interest in this case is less than compelling. The Promise Scholarship is a secular program that rewards superior achievement by high school students who meet objective criteria. It is awarded to students; no state money goes directly to any sectarian school. Scholarship funds would not even go indirectly to sectarian schools or for non-secular study unless an individual recipient were to make the personal choice to major in a subject taught from a religious perspective, and then only to the extent that the proceeds are used for tuition and are somehow allocable to the religious major. See Zelman v. Simmons-Harris, ___ U.S. ___, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002) (emphasizing importance of neutrality and individual choice in upholding voucher program). The proceeds (approximately $1,500 in Davey's year) may be used for any education-related expense, including food and housing; application to religious instruction is remote at best. HECB does not argue otherwise. In these circumstances it is difficult to see how any reasonably objective observer could believe that the state was applying state funds to religious instruction or to support any religious establishment by allowing an otherwise qualified recipient to keep his Scholarship.
 
 
 41
 We hold that HECB's policy denying a Promise Scholarship to a student otherwise qualified for it according to objective criteria solely because the student decides to pursue a degree in theology from a religious perspective infringes his right to the free exercise of his religion. As the Court recently reiterated, the "guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse." Good News Club, 533 U.S. at 114, 121 S.Ct. 2093 (quoting Rosenberger, 515 U.S. at 839, 115 S.Ct. 2510).
 
 
 42
 Therefore, the criterion that conditions receipt of the Promise Scholarship on the recipient's not pursuing a degree in theology taught from a religious perspective must be stricken. HECB may not rely on Wash. Rev.Code § 28B.10.814 because its classification based on religion is unconstitutional as applied through HECB's policy to Davey. Nor does the establishment clause in Washington's Constitution excuse HECB's disabling Davey from receipt of the Promise Scholarship to which he was otherwise entitled under the program's objective criteria solely on account of his personal decision to pursue a degree in theology.
 
 III
 
 43
 Given this disposition, it is not necessary to reach Davey's claims that HECB's policy abridges other constitutional rights as well. We express no view with respect to any of them except for his argument that HECB's policy violates the Washington Constitution. These issues are waived because Davey failed to argue and brief the Gunwall[9] factors. Buckles v. King County, 191 F.3d 1127, 1138 (9th Cir.1999).
 
 
 44
 REVERSED.
 
 
 
 Notes:
 
 
 [1]
 Wash. Rev.Code § 28B.10.814 provides that "[n]o aid shall be awarded to any student who is pursuing a degree in theology."
 
 
 [2]
 Article I, § 11 of the Washington Constitution provides:
 Absolute freedom of conscience in all matters of religious sentiment, belief and worship, shall be guaranteed to every individual, and no one shall be molested or disturbed in person or property on account of religion; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace and safety of the state. No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment....
 
 
 [3]
 HECB's policy is codified at Wash. Admin. Code § 250-80-020(12). It provides:
 `Eligible student' means a person who:
 (a) Graduates from a public or private high school located in the state of Washington; and
 (b) Is in the top ten percent of his or her 1999 graduating class; or
 (c) Is in the top fifteen percent of his or her 2000 graduating class; and
 (d) Has a family income less than one hundred thirty-five percent of the state's median; and
 (e) Enrolls at least half time in an eligible postsecondary institution in the state of Washington; and
 (f) Is not pursuing a degree in theology.
 
 
 [4]
 The named defendants are Gary Locke, Governor of the State of Washington; Marcus S. Gaspard, Executive Director of the Higher Education Coordinating Board; Bob Craves, Chair of the Higher Education Coordinating Board; and John Klacik, Associate Director of the Higher Education Coordinating Board. We refer to them collectively as "HECB."
 
 
 [5]
 Justice Brennan's concurring opinion expounds both points more broadly than the plurality. As he saw it, a religious classification governing eligibility for office discriminates on the basis of belief as well as status and is "absolutely prohibited." 435 U.S. at 632, 98 S.Ct. 1322 (Brennan, J., concurring). Further, citingSherbert, he wrote that in his view, the "proposition — that the law does not interfere with free exercise because it does not directly prohibit religious activity, but merely conditions eligibility for office on its abandonment — is also squarely rejected by precedent." Id. at 633, 98 S.Ct. 1322.
 
 
 [6]
 See, e.g., Bd. of Regents of the Univ. of Wis. Syst. v. Southworth, 529 U.S. 217, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000) (citing Rust for the proposition that government may appropriate funds to advocate its own policies); Legal Servs. Corp. v. Velazquez, 531 U.S. 533, 541, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001) (noting that counseling activities of doctors under the federal funding program in Rust amounted to government speech); Downs v. Los Angeles Unified Sch. Dist., 228 F.3d 1003, 1013-16 (9th Cir.2000) ("Simply because the government opens its mouth to speak does not give every outside individual or group a First Amendment right to play ventriloquist"; government can decide who may speak as its representative); cf. Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (upholding competitive grants according to subjective criteria).
 
 
 [7]
 InVelazquez, the Court struck down a restriction on use of Legal Services Corporation funds, distinguishing Rust on the ground that Congress did not single out a particular idea for suppression because it was dangerous or disfavored, or discriminate against viewpoints on abortion, but rather prohibited Title X doctors from counseling that was outside the scope of the project. 531 U.S. at 541, 121 S.Ct. 1043.
 
 
 [8]
 Other state cases to which HECB refers are not helpful on this issue. They have to do with state aid to sectarian schools rather than state aid to students who use it to pursue a nonsectarian degreeSee, e.g., California Teachers Ass'n v. Riles, 29 Cal.3d 794, 176 Cal.Rptr. 300, 632 P.2d 953 (1981) (state program providing books directly to sectarian schools violated California's version of the establishment clause); Elbe v. Yankton Indep. Sch. Dist., 640 F.Supp. 1234 (D.S.D.1986) (aid to sectarian schools deemed contrary to the state constitution); Bagley v. Raymond Sch. Dep't, 728 A.2d 127 (Maine 1999) (Maine's policy of excluding religious schools from a tuition program paid directly to the school does violate the Free Exercise Clause); Epeldi v. Engelking, 94 Idaho 390, 488 P.2d 860 (1971) (application of funds to school districts prohibited by state's establishment clause); Bd. of Educ. for Indep. Sch. Dist. No. 52 v. Antone, 384 P.2d 911 (Okla.1963) (transporting parochial students to Catholic school on public buses violates state constitutional bar on aid for religious education).
 
 
 [9]
 State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986) (identifying factors that Washington Supreme Court considers when determining whether state constitutional provisions are more stringent than their federal counterparts).
 
 
 McKEOWN, Circuit Judge, dissenting:
 
 45
 The majority suggests that we begin with first principles, and I do as well. The genesis of this controversy is not the Washington statute or its implementing regulations. Instead, we must start where the State of Washington began over a hundred years ago — long before it created the Promise Scholarship — when it defined its vision of religious freedom as one completely free of governmental interference, a vision the State explicitly refused to taint by the influx of public monies into religious instruction. Specifically, I refer to that original provision of the state's 1889 constitution which provides that "No money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment." Wash. Const. art. I, § 11.
 
 
 46
 As for guiding federal principles, I likewise recognize that the First and Fourteenth Amendments circumscribe a state's ability to interfere with an individual's exercise of religion, specifically mandating that a state "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." In the State of Washington's case, it has assiduously avoided violating the first tenet of the Religion Clauses, and in doing so has not overstepped the bounds of the latter. The simple truth is that Washington has neither prohibited nor impaired Davey's free exercise of his religion. He is free to believe and practice his religion without restriction. Nor has the state prohibited Davey from exercising his right to choose among the full gamut of academic pursuits offered by Northwest College. In fact, Davey is still pursuing the same pastoral studies degree today that he claims the state prohibited him from pursuing three years ago. The only state action here was a decision consonant with the state constitution, not funding "religious ... instruction."
 
 
 47
 Davey, the majority, and I are all in the same boat in one respect — we are struggling with where to place Davey's case on the spectrum of Supreme Court jurisprudence. In my view, the outcome of the case depends on how the question is framed. I see the question as being whether the State of Washington may constitutionally decline to fund pastoral studies as part of its Promise Scholarship. Likewise, I see the analysis as following the framework of the question. This is a funding case, not a free exercise case or a free speech case. The State of Washington, based on its constitution, made a straightforward decision not to fund a degree in pastoral studies. In other words, in an effort to maintain the separation between church and state, the state decided that it has no obligation to financially support a student to become a minister. Because I conclude, unlike the majority, that the Supreme Court's jurisprudence in the abortion funding cases guides our decision here, I respectfully dissent.
 
 
 48
 * Before addressing the funding cases, I must first disagree with Davey that the Supreme Court's free exercise jurisprudence gives us sufficient guidance to warrant a decision in his favor.
 
 
 49
 Davey relies primarily on the Court's decisions in Church of the Lukumi Babalu Aye v. City of Hialeah, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) and McDaniel v. Paty, 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978), to argue that the State's decision not to fund religious activities impermissibly discriminates against him by (1) "singling out" students who would otherwise pursue a theology degree; and (2) forcing them to make the difficult decision of choosing to accept funding at the expense of foregoing religious study for the first two years of post-secondary education. Those decisions simply do not support this conclusion.
 
 
 50
 As the majority here acknowledges, Lukumi is hardly Davey's case. There, the challenged ordinances were the rare but quintessential example of laws that directly prohibit certain religious practices. In particular, the laws at issue in that case authorized fines and even imprisonment for activities — the ritualistic slaughter of animals — that constitute a central practice of the Santeria religion. Nothing could have more clearly prohibited the church members' religious exercise than these criminal sanctions: Their choice was to practice their religion upon threat of prosecution. In contrast, Davey's decision to pursue a degree in theology carries no such ominous retribution. As a consequence, I do not find any guidance in Lukumi beyond the criminal ordinances at issue there as to what might constitute an impermissibly burdensome law prohibiting religious exercise.
 
 
 51
 As the Court explained in Lukumi, "upon even the slight suspicion that proposals for state intervention [in religious exercise] stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures." 508 U.S. at 547, 113 S.Ct. 2217. Considering Washington's long-standing practice of prohibiting religious funding as a matter of encouraging the unfettered free exercise of religion and the state's "hands off" approach, we should have no such suspicion of animosity in this case. The mere fact that Wash. Rev.Code § 28B.10.814 "refers on its face to religion" does nothing to satisfy the ultimate free exercise concern in Lukumi. Nor does the statute's focus on theology majors help discern whether legislators have impermissibly "devise[d] mechanisms, overt or disguised, designed to persecute or oppress a religion or its practices." Id. Rather, on this record, Washington's decision not to fund religious education simply reflects its strong desire, as reflected in its constitution since ratification in 1889, to insulate itself from the appearance of endorsing religion — a concern cut from cloth wholly distinct from the pernicious distrust of the Santeria religion that clothed the city ordinances in Lukumi. Compare id. at 542, 113 S.Ct. 2217 ("The ordinances had as their object the suppression of religion.").
 
 
 52
 Neither Davey nor the majority seriously contends that either Section 11 of the Washington State Constitution or Wash. Rev.Code § 28B.10.814 was intended to suppress religion. And, because Davey was still able to pursue his chosen major in the absence of funding, he would be hard-pressed to argue that either of these provisions has the unintended effect of suppressing his religious exercise. Nevertheless, Davey argues, and the majority agrees, that the state's funding scheme imposes an unconstitutional condition upon its acceptance. They cite the Supreme Court's 1978 decision in McDaniel v. Paty, 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978), which in turns finds support in the Court's earlier decision in Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). Although the majority extracts from these decisions the general proposition that a state may not offer a benefit to all to the exclusion of others on the basis of religion, neither McDaniel nor Sherbert supports such a broad prohibition on government action as to encompass its funding decisions for purposes of higher education.
 
 
 53
 To begin, McDaniel presented the Court with something of a unique quandary. Specifically at issue there was a provision of the Tennessee state constitution that ultimately pitted McDaniel's constitutional right to seek and hold office as a state citizen against the clergy-disqualification provisions of the state's constitution. Added on top of this was what the Court characterized as McDaniel's federal constitutional right to be a minister, thus leaving it with a multi-level constitutional dilemma: "McDaniel cannot exercise both [federal and state constitutional] rights simultaneously because the state has conditioned the exercise of one on the surrender of the other. Or, in James Madison's words, the State is `punishing a religious profession with the privation of a civil right.'" 435 U.S. at 626, 98 S.Ct. 1322 (plurality opinion) (quoting 5 WRITINGS OF JAMES MADISON 288 (G. Hunt ed.1904)).
 
 
 54
 Whatever the merits or reach of the unconstitutional conditions doctrine, it is clear that its invocation in McDaniel came about in a situation wholly dissimilar to ours: there, the "privation of a civil right" that McDaniel's religious exercise would engender involved one of the most basic and fundamental democratic rights one could imagine — the opportunity to directly engage in the political process. Here, on the other hand, Davey's concerns are not so weighty. Unlike McDaniel, this case does not juxtapose two fundamental rights. We are not talking about some constitutional right to educational funding (which, incidently, there is not, see San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 35, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)); rather, we are talking about the "privation" of a scholarship — one which Davey apparently did not need, although he obviously would have appreciated, to pursue his desired major.
 
 
 55
 Perhaps most telling about the limited application of the unconstitutional conditions doctrine in the free exercise arena is the failure of Davey or the majority to seek support (except tangentially by means of McDaniel's explicit reliance on it)[1] from the Court's decision in Sherbert. It becomes clearer upon inspection why Davey relies on this case only in passing. Specifically, Sherbert makes explicit that which the fractured decision in McDaniel only opaquely acknowledges by means of its unique facts: the unconstitutional conditions doctrine only arises in the free exercise context when the government benefit would impose a substantial burden on the potential recipient. Sherbert, 374 U.S. at 403-404, 83 S.Ct. 1790. No less than with McDaniel, a comparison of the facts in Sherbert with those here demonstrate how far Davey's case comes from falling within the scope of this doctrine.
 
 
 56
 In Sherbert, the Free Exercise Clause was not pitted against any sort of constitutional right; rather, at issue were unemployment compensation "benefits." The important distinction in Sherbert, however — which may prove to be the reason Davey does not press it here — is not what appears to be the Court's recent attempts to cabin its significance somewhere on the musty shelves of history, see Employment Div., Dep't of Human Res. of Oregon v. Smith, 494 U.S. 872, 884, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (declining "to breathe into Sherbert some life beyond the unemployment compensation field"), but instead the nature of the choice that Sherbert had to make.
 
 
 57
 "Under the Sherbert test," only "governmental actions that substantially burden a religious practice must be justified by a compelling governmental interest." Smith, 494 U.S. at 883, 110 S.Ct. 1595 (citing Sherbert, 374 U.S. at 402-03, 83 S.Ct. 1790) (emphasis added). Thus, in Sherbert, the Court concluded that the petitioner would shoulder a burden of unconstitutional proportions if her receipt of unemployment compensation was conditioned on working during "the Sabbath Day of her faith": "[T]o condition the availability of benefits upon [Sherbert's] willingness to violate a cardinal principle of her religious faith effectively penalizes the free exercise of her constitutional liberties." 374 U.S. at 399, 406, 83 S.Ct. 1790.
 
 
 58
 In other words, to receive the benefits to which she would otherwise be entitled, Sherbert was required to engage indefinitely in an activity that was repugnant to her faith. Again, this is hardly Davey's case — either factually or hypothetically. As a matter of fact, Davey has sustained no substantial burden; he continues to pursue his double major in Pastoral Studies and Business Management.
 
 
 59
 This brings me to a final point of distinction that may be less than explicit in the Sherbert decision, but should not be ignored, particularly since the Court after Sherbert seems to have limited its reach to the unemployment context (McDaniel's uniquely burdensome situation not withstanding): Sherbert not only faced a substantial burden to her religious convictions had she accepted the unemployment benefits, but she also would have potentially suffered an even worse fate had she not. After being fired from her job because of her religious convictions, Sherbert was still unable to find any employment for the same reason. Without the state's help, she was unable to help herself. When we consider Davey's own testimony that his decision to forego the scholarship merely led him to finding available after-school work to make up the difference, I cannot conclude that he faced a "substantial burden," whatever his ultimate choice.[2]
 
 II
 
 60
 Perhaps sensing the infirm footing these free exercise cases provide, Davey reaches across the First Amendment divide, leading the majority to find support for the expansive vitality of the unconstitutional conditions doctrine in cases addressing the abridgment of speech. But, as long as we are looking beyond the free exercise arena, we should first recognize the indistinguishable similarity between this case and those that address the abortion funding cases, which conclude that the denial of funding does not "unduly burden" a woman's entitlement to have an abortion.
 
 
 61
 In my view, the abortion funding cases provide the closest analog to Davey's case. Davey has a constitutionally-protected right to exercise his religious beliefs, including a decision to be a pastoral studies major, but the state has no obligation to fund that religious pursuit, even when it has chosen to fund other educational pursuits. Likewise, a woman has a constitutionally-protected right to an abortion, but the state has no obligation to fund that right, even when it has chosen to fund other medical procedures. This result in the case of abortion is incredibly harsh, particularly for a woman who is indigent and effectively has no choice in terms of exercise of her constitutional right. Davey's case presents no parallel dilemma. The state's decision not to fund religious education does not deprive Davey of his chosen profession or his ability to practice his religion without restriction. But, if Davey is right, then perhaps he will pave the way for reconsideration of the abortion funding paradox.
 
 
 62
 "The crucial word in the constitutional text is `prohibit': `For the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government.'" Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 451, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988) (quoting Sherbert, 374 U.S. at 412, 83 S.Ct. 1790 (Douglas, J., concurring)). Therefore, whether we are talking about government action that directly affects religious free exercise or does so only indirectly, the relevant inquiry must focus upon the nature of the government action and, in particular, whether it "substantially burden[s] a religious practice." Smith, 494 U.S. at 883, 110 S.Ct. 1595.
 
 
 63
 Much as the government may not "prohibit" or otherwise "substantially burden" the free exercise of religion without violating the Constitution, the Court has similarly characterized the right to abortion when it held that the Constitution "protects the woman from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy." Maher v. Roe, 432 U.S. 464, 473-74, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977).
 
 
 64
 Significantly, for purposes of comparison to our case, the Court has held that the express denial of funding by a state for abortions does not so burden that right — even when the individual is indigent or otherwise qualified for medical benefits:
 
 
 65
 The [state regulation prohibiting abortion funding] places no obstacles absolute or otherwise in the pregnant woman's path to an abortion. An indigent woman who desires an abortion suffers no disadvantage as a consequence of [the state's] decision to fund childbirth; she continues as before to be dependent on private sources for the service she desires. The State may have made childbirth a more attractive alternative, thereby influencing the woman's decision, but it has imposed no restriction on access to abortions that was not already there. The indigency that may make it difficult and in some cases, perhaps, impossible for some women to have abortions is neither created nor in any way affected by the [state's] regulation.
 
 
 66
 Id. at 474, 97 S.Ct. 2376 (emphasis added); see also Harris v. McRae, 448 U.S. 297, 316, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (no unconstitutional burden even when woman would terminate pregnancy for health reasons). I can discern no difference here. In Davey's case, the State of Washington may have made the pursuit of a non-theology degree more attractive by virtue of the scholarship award, but at the same time has not "burdened" Davey by making the pursuit of his chosen degree any more difficult than it would have been in the absence of this funding. Consequently, no less than "the constitutional freedom recognized in [Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973),] and its progeny," the freedom to exercise one's religion should not "prevent [Washington] from making a value judgment favoring [the funding of non-theology degrees] over [theology degrees], and ... implement[ing] that judgment by the allocation of public funds." Harris, 448 U.S. at 314, 100 S.Ct. 2671 (internal quotation marks and citations omitted).
 
 
 67
 Whether these abortion cases will maintain their vitality over time, they represent an inescapable conclusion as to the lack of a burdensome effect of funding decisions, a conclusion that should have even more purchase in the context of the Religion Clauses. I say this because the Court's decisions in the abortion cases, and particularly in Maher, which addressed the funding decisions of state legislatures, appear to rest upon a sensitivity to the difficult policy choices states must make between competing and significant interests:
 
 
 68
 There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy. Constitutional concerns are greatest when the State attempts to impose its will by force of law; the State's power to encourage actions deemed to be in the public interest is necessarily far broader.
 
 
 69
 Maher, 432 U.S. at 475, 97 S.Ct. 2376. Thus, in the context of medical welfare, the Court was even willing to endorse the legislature's decision to encourage benefit recipients to choose childbirth over abortion by effectively making it the less expensive and more readily available alternative for indigent women. Of course, in Davey's case, we need not even conclude that the state was attempting to influence such a controversial choice if we uphold Washington's decision not to have its taxpayers' dollars used for religious purposes.
 
 
 70
 Unlike the abortion cases, there is no suggestion here that the State of Washington is actively attempting to encourage — as a matter of public policy or otherwise — Davey or others like him to pursue a purely secular education. Indeed, the scholarship may be used at a religious college. Instead, the indisputable driving force behind § 28B.10.814 and Section 11 of the Washington State Constitution is the state's strong prophylactic interest in steering clear of endorsing or supporting religion through direct funding of religious pursuits — regardless of the various religious paths its citizens may freely choose to pursue on their own. Certainly if the Court is willing to conclude that funding decisions do not impose a substantial burden even when they represent a legislature's desire to encourage one choice over another, we must conclude that they do not impose such a burden when, as here, the state's allocation of resources is guided by a wholly separate concern than a preference of which choice the recipient makes.
 
 III
 
 71
 As I have noted, Davey and the majority take a decidedly different tack as they race around the free exercise jurisprudence to the seemingly safe harbors of Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), and the free speech cases. Whatever nirvana the expansive public forum doctrine may seem to provide, it cannot be stretched to cover Davey's claims. As attractive as Rosenberger may be insofar as it involves funding decisions in an educational setting, Davey's is not a free speech case, or at least has not been treated (and in my view, correctly so) as such by the majority. More explicitly, the decision not to fund Davey's pursuit of a pastoral ministry degree does not implicate the free speech viewpoint concerns that drove the Court's decision in Rosenberger.
 
 
 72
 The underlying rationale for the general prohibition on content discrimination is the concern that it "raises the specter that the government may effectively drive certain ideas or viewpoints from the marketplace." Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd., 502 U.S. 105, 116, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991). Thus, the argument can at least be made, as it was in Rosenberger, that the failure to fund a religious publication might impermissibly limit students' access to a full panoply of intellectual perspectives, an important concern in the university setting. See Rosenberger, 515 U.S. at 835, 115 S.Ct. 2510 (danger is "chilling of individual thought and expression" which "is especially real in the University setting, where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition"). But to extend this argument to the failure to fund Davey's pursuit of a theology degree would stretch the viewpoint rationale to the breaking point of credulity.
 
 
 73
 Whereas the funding decision in Rosenberger directly affected the vehicle of a viewpoint's dissemination, i.e., an actual publication, there can be absolutely no concern here that the State of Washington has precluded, will preclude, or is even likely to preclude Davey from being exposed to the pervasively Christian perspective that permeates every aspect of his educational experience at Northwest College. In particular, Washington has done nothing to impede Northwest from disseminating its decidedly religious viewpoint.
 
 
 74
 Whether Davey chooses to pursue a theology degree or a business management degree or any other degree, he will undoubtedly be exposed to a "concept of education" and a viewpoint that Northwest itself describes as "distinctively Christian in the evangelical sense." Northwest College Mission Statement, http://www.nwcollege.edu/about/ mission.html (as submitted in Davey's excerpts of record and viewed on June 15, 2000). Whether or not Davey studies to be a minister, he will participate in an educational experience at an institution whose mission "is to provide, in a distinctly evangelical Christian environment, quality education to prepare students for service and leadership." Id. And no matter what degree Davey pursues, Northwest assures him that his educational experience will "develop the whole person through general studies integrated with biblical knowledge." Id. To make no mistake about it, Northwest ensures its students that it
 
 
 75
 seeks to relate biblical Christianity to every area of life, both on and off campus: to academic disciplines, to co- and extracurricular activities, in the residence halls, in the local community, and in one's personal life. It assumes that all members of the Northwest community desire meaningful involvement in the process of Christian higher education as they seek to express their faith in the context of an Assemblies of God college. Faculty and staff members commit themselves to be facilitators and learners in this educational endeavor. Students, by enrolling, join with them in accepting the responsibilities of membership in this community.
 
 
 76
 
 Id.
 
 
 
 77
 No aspect of Washington's scholarship program chills Davey's "individual thought and expression." Rosenberger, 515 U.S. at 835, 115 S.Ct. 2510. The State of Washington has simply decided not to fund Davey's training as a minister, and in no way can this decision be perceived as one that might "effectively drive certain ideas or viewpoints from the marketplace," particularly from Northwest's uniquely Christian "marketplace." In sum, the viewpoint concerns raised in Rosenberger are simply unfounded in this case.
 
 
 78
 To the extent that Davey's case is, nevertheless, "not much different" from the speech cases, majority op. supra at 756, it cannot be because it presents the same sort of speech concerns implicated in Rosenberger. Rather, it must be because the refusal to fund Davey's religious studies somehow imposes a wholly distinct burden on his free exercise right; in other words, it returns us back to Davey's initial complaint that the State has unconstitutionally conditioned the receipt of its benefits, which leads me to reiterate that Davey is free to use his scholarship at a religious institution. He is absolutely free to discuss religion and study it for purposes of becoming a minister. He suffers no disadvantage as a consequence of the State's decision to fund other educational pursuits. Davey is just as reliant on private sources of aid for his education as he was before he applied for the scholarship funds.
 
 
 79
 Nonetheless, the majority concludes that Washington has prohibited Davey's free exercise of religion, or more accurately that the State has attempted to suppress "dangerous ideas," maj. op. supra at 755, despite the clear and consistent message in its constitution that the citizens of Washington are more concerned about the potentially dangerous distortion that the state funding of religious activities might create, not the suppression of ideas, dangerous or otherwise. Nothing in this statutory scheme implicates Davey's ability to express his beliefs. If such is the result of a decision to fund certain activities to the exclusion of others (that is, if funding decisions somehow coerce an individual's free exercise of religion), then I cannot see how the rationale of the abortion funding cases can survive. As expressed by the Supreme Court, the freedom to exercise the choice of religion cannot be distinguished from the freedom to exercise the choice between childbirth and abortion. Therefore, if the "bottom line," as the majority suggests is that the funding/forum distinction does not end at the frontier of free speech and concerns about viewpoint discrimination, maj. op. supra at 756, then it must at least reach to the abortion context where that right has been characterized in exactly the same fashion as that concerning the free exercise of religion.
 
 IV
 
 80
 In the Court's most recent pronouncement in the religion arena, Zelman v. Simmons-Harris, ___ U.S. ___, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002), Justice Thomas specially concurred to express his opinion that "state action should be evaluated on different terms [in the context of the Establishment Clause] than similar action by the Federal Government," concluding that federal courts should "strike a proper balance between the demands of the Fourteenth Amendment on the one hand and the federalism prerogatives of States on the other." Id., 122 S.Ct. at 2481 (Thomas, J., concurring). Concededly, Justice Thomas was suggesting that states should be allowed more constitutional freedom to experiment with involvement in religion, id., but I cannot conclude that such federalism concerns should represent a one-way street when it comes time for a state to decide whether to enter into the ill-defined terrain of the Establishment Clause's jurisprudence.
 
 
 81
 No less than the State of Ohio's decision to fund students' sectarian education, which the Court endorsed in Zelman, the State of Washington's decision not to "experiment" in the funding of religious indoctrination should represent an equally valid concern — both as a matter of federalism and with respect to the more explicit limitations of the Religion Clauses. Thus, in the absence of a more substantial burden than this decision has placed on Davey's choice of study, I conclude that Washington has successfully navigated the tensions between the free exercise of religion and the prohibition of its endorsement when, at the time of statehood, it decided to refrain from funding religious instruction. I therefore respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 InMcDaniel, there was no opinion of the Court; however, a majority of Justices did agree that the rationale of Sherbert controlled its decision. See 435 U.S. at 626, 98 S.Ct. 1322 (opinion of Burger, C.J., joined by Powell, Rehnquist, and Stevens, JJ.); id at 633, 98 S.Ct. 1322 (opinion of Brennan, J., joined by Marshall, J.).
 
 
 [2]
 Even as described by Davey, the actual burden is indeed small. Based on his declaration, Davey would have to work only a few extra hours a week at his present job. Davey Declaration ¶ 35-37