# Authority of FEMA to Provide Disaster Assistance to Seattle Hebrew Academy

The Stafford Disaster Relief and Emergency Assistance Act of 1974 and its implementing regulations permit the Federal Emergency Management Agency to provide federal disaster assistance for the reconstruction of Seattle Hebrew Academy, a private religious school that was damaged in an earthquake in 2001.

The Establishment Clause of the First Amendment does not pose a barrier to the Academy's receipt of such aid.

September 25, 2002

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
FEDERAL EMERGENCY MANAGEMENT AGENCY

You asked us to analyze whether the Federal Emergency Management Agency ("FEMA") may, consistent with the Stafford Disaster Relief and Emergency Assistance Act of 1974 ("the Act"), 42 U.S.C.A. §§ 5121-5206 (1995 & West Supp. 2002), the Act's implementing regulations, and the Establishment Clause of the First Amendment, provide disaster assistance to the Seattle Hebrew Academy ("the Academy"). The Academy, like many other Seattle institutions, sustained severe damage as a result of the Nisqually Earthquake on February 28, 2001. For the reasons set forth below, we conclude that the Act and its implementing regulations permit FEMA to provide a disaster assistance grant to the Academy, and that the Establishment Clause does not pose a barrier to the Academy's receipt of such aid.

## I.

The Academy, a private nonprofit educational facility for Jewish students, applied to FEMA for disaster assistance pursuant to section 406 of the Act, 42 U.S.C.A. § 5172(a)(1)(B). The Act authorizes the President to "make contributions . . . to a person that owns or operates a *private nonprofit facility* damaged or destroyed by a major disaster for the repair, restoration, reconstruction, or replacement of the facility and for associated expenses incurred by the person." *Id*. (emphasis added). In 1979, the President transferred to FEMA this and other disaster relief functions that previously had been delegated or assigned to other Federal agencies. *See* Exec. Order No. 12148, § 1-102, 3 C.F.R. 412, 413 (1980).

On March 28, 2001, a FEMA Public Assistance Officer denied the Academy's application for assistance. The Academy appealed to the FEMA Region X Regional Director. The Region X Acting Regional Director denied the appeal on October 19, 2001, on the ground that the Academy's building was not a "private nonprofit facility" for purposes of section 406(a)(1)(B) because it was not open to

"the general public." *See* Letter for Donna J. Voss, Deputy State Coordinating Officer, Public Assistance, Emergency Management Division, State of Washington Military Department, from Tamara D. Doherty, Acting Regional Director, Region X, FEMA, at 1 (Oct. 19, 2001) ("Doherty Letter"). In so ruling, the Acting Regional Director determined that a religiously affiliated educational facility is not open to "the general public" if it only admits students of a particular faith. *Id*.

The Academy has appealed the Acting Regional Director's decision. *See* Letter for Donna Voss, Washington State Public Assistance Officer, Washington State Disaster Field Office, from Ulrike I. Boehm, Attorney for SHA, Latham & Watkins, *Re: Seattle Hebrew Academy* (Dec. 21, 2001) ("Boehm Letter"). It is our understanding that the Academy's appeal is presently being considered by the FEMA Associate Director for Response and Recovery. *See* 44 C.F.R. § 206.206(b)(2) (2001). You asked for our views on whether FEMA is required by statute or regulation to apply a "general public" requirement to all eligible private nonprofit facilities or otherwise to disqualify a religiously sponsored educational facility on the ground that it only admits students of a particular faith. If the Act and its implementing regulations do not require that FEMA deny funding to the Academy, you also asked for our views on whether such funding would violate the Establishment Clause of the First Amendment.

## II.

### A.

On its face, 42 U.S.C.A. § 5172(a)(1)(B) requires the President to find only that a potential disaster relief recipient "owns or operates a private nonprofit facility" damaged or destroyed in a major disaster. The Acting Regional Director's denial of the Academy's application added another requirement—that the facility be open to "the general public." In so ruling, she relied upon the FEMA regulation defining "private nonprofit facility," which provides in relevant part:

> *Private nonprofit facility* means any private nonprofit educational, utility, emergency, medical, or custodial care facility, including a facility for the aged or disabled, and other facility providing essential governmental type services *to the general public*, and such facilities on Indian reservations.

44 C.F.R. § 206.221(e) (2001) (second emphasis added). The Acting Regional Director construed this regulation to mean that, in order to qualify for relief under section 406(a)(1)(B) of the Act, any and all private nonprofit facilities—including educational facilities—must provide essential governmental type services to "the general public," and that a religiously affiliated educational facility does not

satisfy this requirement if it limits admission to students of a particular religious faith. *See* Doherty Letter.[1]

We believe that the Acting Regional Director's reading of 44 C.F.R. § 206.221(e) is not the better interpretation of that regulation. Under the most natural reading of section 206.221(e), the phrase "providing essential governmental type services to the general public" modifies only the "other facilit[ies]" referenced in the clause in which that phrase appears; the requirement to be open to the general public does *not* apply to the types of facilities—namely, "educational, utility, emergency, medical, or custodial care facilit[ies], including a facility for the aged or disabled"—enumerated *prior to* the regulation's "general public" clause. These five types of facilities, and "facilities on Indian reservations," are both set off in independent clauses.[2] Thus, the text of the regulation does not support imposition of a "general public" requirement upon *any* of these facilities.[3]

FEMA has defined four of the types of facilities identified in the statute in a manner that does not impose a "general public" requirement. Most important for present purposes, FEMA's definition of "[e]ducational facilities" does not impose such a requirement. *Id*. § 206.221(e)(1). *See also id*. § 206.221(e)(2), (5), (6) (defining "[u]tility," "[m]edical facility," and "[c]ustodial care facility" in a manner that does not impose a "general public" requirement upon such facilities).[4]

---

[1] The record is somewhat unclear as to whether the Academy strictly limits admission to Jewish students. At the time of the earthquake, the Academy's by-laws prohibited admission of non-Jewish students, although the Academy maintains that it no longer abides by this by-law. *See* Doherty Letter at 1. It is undisputed that the Academy grants admission only to otherwise eligible non-Jewish students who agree to "seriously study[] and practic[e] Jewish law and culture in their home[s], under the supervision and instruction of a rabbi." Boehm Letter at 9. Our reasoning, however, does not depend upon the precise nature of the Academy's admission requirements.

[2] As explained below, although section 206.221(e) was crafted to implement a 1988 statutory definition that references the provision of services "to the general public" (42 U.S.C.A. § 5122(9)), that provision cannot fairly be read to require that educational facilities provide services "to the general public." We begin with the regulatory language, however, because it differs slightly from the statutory language: in promulgating its definition of "private nonprofit facility," FEMA (1) replaced the statutory phrase "other private nonprofit facilities which provide" with the phrase "and other facility providing," and (2) added the term "such" before "facilities on Indian reservations." Collectively, these changes make it slightly more plausible to conclude that *all* of the referenced facilities are subject to the "general public" requirement. As explained in the text, however, we think it is most reasonable to read the three clauses of section 206.221(e)—the first, which lists five types of covered facilities; the second, which pertains to facilities providing "essential governmental type services"; and the third, which pertains to "facilities on Indian reservations"—as separate and independent clauses, of which only the second contains a "general public" requirement.

[3] Notably, the Acting Regional Director replaced the middle and final clauses of 44 C.F.R. § 206.221(e) with ellipses, so as to make the provision appear to state: "Private nonprofit facility means any nonprofit educational . . . facility providing essential governmental type services to the general public . . . ." Doherty Letter at 1. As explained in the text, this quotation is relevant for what it omits.

[4] For some reason section 206.221(e) contains no definition of "rehabilitational" facilities, although that term appears, along with the other types of facilities enumerated in the first clause of the rule, in 42 U.S.C.A. § 5122(9).

By contrast, FEMA's definition of "[o]ther essential governmental service facility" does contain a "general public" requirement. *Id*. § 206.221(e)(7).[5] Thus, if the portion of section 206.221(e) relied upon by the Acting Regional Director is simply interpreted in a manner consistent with FEMA's own regulatory definition of "educational facilities," there is no basis for imposing a "general public" requirement upon the Academy. As explained above, however, we do not believe that the text of section 206.221(e) supports imposition of a "general public" requirement upon any of the facilities enumerated in the first clause of that regulation.

It is evident that FEMA promulgated section 206.221(e) in order to implement a 1988 statutory definition that references the provision of services "to the general public." 42 U.S.C.A. § 5122(9).[6] It thus appears that the Acting Regional Director may have adopted her construction of section 206.221(e) on the assumption that it is the best, or only, interpretation of the *statutory* definition of "private nonprofit facility." As we explain below, 42 U.S.C.A. § 5122(9) cannot fairly be interpreted in that manner. Furthermore, once it is understood that 42 U.S.C.A. § 5122(9) does not support, let alone compel, a regulation of such breadth, the regulatory interpretation adopted by the Acting Regional Director becomes far less tenable.

**B.**

Second, and more importantly, even if 44 C.F.R. § 206.221(e) could reasonably be construed to require the denial of FEMA assistance to the Academy, such a result would be inconsistent with the terms of the statutory provision that section 206.221(e) implements (42 U.S.C.A. § 5122(9)), and is not authorized by the

---

[5] Although FEMA's regulatory definitions do impose a "general public" requirement on "[i]rrigation facilit[ies]" and "[e]mergency facilit[ies]," 44 C.F.R. § 206.221(e)(3)-(4), we are aware of (and FEMA has provided) no reason, based in the statute or policy, why these facilities ought to be treated differently from the other types of facilities enumerated in the first clause of section 206.221(e). We are aware that in 2000, Congress amended the statutory definition to add the word "irrigation" to the definition of private nonprofit facilities, and the legislative history indicates that "[i]rrigation facilities should be eligible for Federal assistance to the extent that they provide water for essential services of a governmental nature *to the general public*." 146 Cong. Rec. 20,583 (2000) (statement of Rep. Fowler) (emphasis added). Representative Fowler, however, appears to have assumed (mistakenly) that the statute requires that *all* eligible private nonprofit facilities provide services to the general public, and that likewise appears to be the only explanation for the express references to the "general public" in FEMA's definitions of "emergency" and "irrigation" facilities. As explained in the text below, the statute itself—even as amended in 2000—provides no warrant for treating irrigation or emergency facilities any differently than educational facilities.

[6] Prior to 1989-90, when FEMA promulgated the regulatory definition of "private nonprofit facility" now found in section 206.221(e), *see* 54 Fed. Reg. 11,610 (1989) (interim rule with request for comments); 55 Fed. Reg. 2297 (1990) (final rule), FEMA's regulatory definition of that term did not make any reference to "the general public." Congress's 1988 statutory amendment, however, did include such a reference. *See infra* p. 119. Thus, it is fair to presume that FEMA promulgated the new definition in order to implement the definition contained in the 1988 Act.

statutory provision that the Acting Regional Director invoked (42 U.S.C.A. § 5151(a)). Upon careful reading, neither of these provisions requires that eligible private nonprofit facilities provide services to "the general public," or that religious schools that limit admission to students of a particular faith be deemed ineligible for disaster relief.

In 1988, in Public Law No. 100-707, 102 Stat. 4689, Congress amended the Disaster Mitigation Act of 1974 to add for the first time a statutory definition of "private nonprofit facility." *See* 102 Stat. at 4690. Section 103(f) of the 1988 Act, as amended and codified, presently provides:

> "Private nonprofit facility" means private nonprofit educational, util-ity, irrigation, emergency, medical, rehabilitational, and temporary or permanent custodial care facilities (including those for the aged and disabled), other private nonprofit facilities which provide essential services of a governmental nature to the general public, and facilities on Indian reservations as defined by the President.

42 U.S.C.A. § 5122(9). In a manner similar to 44 C.F.R. § 206.221(e) (*see supra* note 2), the provision defines three categories of private nonprofit facilities: seven types of enumerated facilities; other facilities that provide "essential services of a governmental nature to the general public"; and facilities on Indian reservations. The language and structure of this provision indicate that the phrase "which provide essential services of a governmental nature to the general public" modifies *only* the second category of eligible facilities—"other private nonprofit facili-ties"—which is identified in the same, middle clause as the "general public" requirement. The phrase does not modify either the first category of enumerated eligible facilities ("private nonprofit educational, utility, irrigation, emergency, medical, rehabilitational, and temporary or permanent custodial care facilities (including those for the aged and disabled)") or the third category of eligible facilities ("facilities on Indian reservations as defined by the President"), both of which are set off in separate, independent clauses. Indeed, the range of institutions found in the first phrase of section 5122(9) itself suggests that the "general public" requirement does not extend to those facilities: in particular, one would not ordinarily think of an "irrigation facility" as being open to the general public, and the text provides no basis for treating irrigation facilities any differently than the other enumerated facilities in this regard. *See supra* note 5.

The statutory history of this definition confirms this interpretation. Private educational institutions first became eligible for disaster assistance in 1972, when Congress gave the President authority to make grants to private nonprofit schools that suffered damage from Hurricane Agnes. Act of Aug. 16, 1972, Pub. L. No. 92-385, § 4, 86 Stat. 554, 556-57. That statute defined which "educational institution[s]" were eligible and further imposed certain conditions on the grants

made to such institutions. *Id.* § 4(b)-(d), 86 Stat. at 556-57. Nowhere, however, did Congress impose any requirement that eligible educational facilities provide services "to the general public."

Congress amended the governing statute in the Disaster Relief Act of 1974 (now known as the Stafford Act), Pub. L. No. 93-288, 88 Stat. 143, which gave the President still broader authority to make grants for the repair or replacement of certain private facilities damaged in major disasters. *See id.* § 402(b), 88 Stat. at 153 (authorizing the President to make grants "to help repair, restore, reconstruct, or replace private nonprofit educational, utility, emergency, medical, and custodial care facilities, including those for the aged or disabled, and facilities on Indian reservations as defined by the President, which were damaged or destroyed by a major disaster"). Here again, however, the statute did not include any reference to facilities providing services to "the general public." Nor, as far as we are aware, did the legislative history suggest a "general public" limitation. *See, e.g.*, H.R. Rep. No. 93-1037, at 37 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 3091, 3102. Not surprisingly, therefore, the regulations implementing the 1974 Act—which contained extensive, detailed limitations on eligibility for funding—thereafter defined "[p]rivate non-profit organization," "[e]ducational [i]nstitution," "[p]rivate non-profit facility," and "[e]ducation[al] facilities," all without reference to any "general public" requirement. *See, e.g.*, 24 C.F.R. § 2205.54(a)(1)-(3), (e), (f) (1976) (HUD regulations); 44 C.F.R. § 205.54(a)(1)-(3), (e), (f) (1979) (FEMA regulations adopting former HUD regulations); 44 C.F.R. §§ 205.2(15), 205.71(a), (d), (e), 205.72(b) (1980-1988) (revised FEMA regulations). It is therefore clear that, prior to the 1988 statutory amendment, neither the statute nor its implementing regulations required educational facilities to provide services to the general public.[7]

It was not until the 1988 amendment discussed above that the governing Act contained any reference to the "general public" whatsoever, and nothing in the language of that amendment or its legislative history suggests that Congress intended to impose a new "general public" requirement for eligibility of those facilities of nonprofit organizations *that already were eligible for relief prior to the amendment*. As the statute's text confirms, Congress *did* intend that facilities within the newly codified "catch-all" category of "other private nonprofit facilities which provide essential services of a governmental nature" would be required to provide services "to the general public." But the only change that Congress made

---

[7] From the time of their initial promulgation, the pre-1988 regulations defined "[e]mergency facilit[ies]" to mean "those buildings, structures, or systems used to provide emergency services, such as fire protection, ambulance, or rescue, *to the general public*." *See, e.g.*, 24 C.F.R. § 2205.54(a)(3)(iii) (1976); 44 C.F.R. § 205.71(d)(3) (1980) (emphasis added). When it first promulgated this regulation, HUD did not explain why it included the "general public" qualifier for emergency facilities. *See* 39 Fed. Reg. 28,212, 28,221 (1974). Notably, however, that same qualifier was not included in any of the other definitions prior to the 1988 amendment, including the definition of "education facilities."

concerning the eligibility of private nonprofit organizations (other than codifying the definition itself) was to establish this new category of eligible facilities—a change that, in the words of the House Committee Report, "broadened" the "definition" of eligible private nonprofit facilities to "include facilities which provide to the general public services of a governmental nature," such as "museums, zoos, community centers, libraries, homeless shelters, senior citizen centers, rehabilitation facilities, and shelter workshops." H.R. Rep. No. 100-517, at 4 (1988), *reprinted in* 1988 U.S.C.C.A.N. 6085, 6088; *see also* 134 Cong. Rec. 4186 (1988) (Congressional Budget Office Cost Estimate, March 16, 1988, included in statement of Rep. Nowak). In sum, there is no evidence that Congress intended to place new restrictions on those facilities that already were eligible for assistance prior to 1988.

For whatever reason, the Acting Regional Director did not invoke section 5122(9) as authority for her decision, notwithstanding the fact that it contains the phrase "general public." Instead, the only statute she cited was 42 U.S.C.A. § 5151(a), which provides:

> The President shall issue, and may alter and amend, such regulations as may be necessary for the guidance of personnel carrying out Federal assistance functions at the site of a major disaster or emergency. Such regulations shall include provisions for insuring that the distribution of supplies, the processing of applications, and other relief and assistance activities shall be accomplished in an equitable and impartial manner, without discrimination on the grounds of race, color, religion, nationality, sex, age, or economic status.

Doherty Letter at 1. For at least two reasons, however, this statutory provision cannot serve as authority either for a rule that all eligible nonprofit facilities must provide services "to the general public," or, more specifically, for a rule making ineligible for aid all private nonprofit facilities that limit admission on the basis of religion.

First, section 5151(a) says nothing about requiring that private recipients of aid provide services "to the general public." Second, and more fundamentally, section 5151(a) is addressed not to discrimination by the *recipients* of FEMA aid, but to discrimination—including religious discrimination—by those engaged in the *provision* of FEMA aid. The regulations that the President is required to issue are "for the guidance of *personnel carrying out Federal assistance functions* at the site of a major disaster or emergency," and must insure "that the *distribution* of supplies, the *processing* of applications, and other *relief and assistance activities* shall be accomplished in an equitable and impartial manner." (Emphasis added.) Accordingly, we do not think that section 5151(a) is authority for the broad

"general public" requirement that the Acting Regional Director would impose on all eligible private nonprofit facilities.[8]

In sum, we have found no statutory provision that requires either that *all* eligible private nonprofit facilities "provide services to the general public,"[9] or that

---

[8] FEMA's definition of eligible private nonprofit "[e]ducational facilities" further provides that such facilities "[may] not include buildings, structures and related items used primarily for religious purposes or instruction." 44 C.F.R. § 206.221(e)(1). We note that there is no longer any basis for this requirement in the text of the Act (the Act formerly provided that educational institutions were ineligible if used primarily for religious purpose, *see* Pub. L. No. 92-385, § 4(c)(4), 86 Stat. at 557)— and, in light of current doctrine (*see infra* Part III), there is some question whether it is consistent with the First Amendment to the Constitution—but in any event the Acting Regional Director specifically found that the religious components of the Academy's class requirements amount to less than 50% of the curriculum, and thus that the Academy's building is not used "primarily for religious purposes or instruction." *See* Letter for Tamara Doherty, Acting Regional Director, Region X, FEMA, from Donna J. Voss, Deputy State Coordinating Officer, Public Assistance, State of Washington, at 1 (July 21, 2001); Staff Analysis, Prepared by Bruce Baardson, Public Assistance Section Supervisor, and Donna Voss, Deputy State Coordinating Officer, Public Assistance, State of Washington, *Re: Seattle Hebrew Academy, First Appeal* at 1, 2 (July 24, 2001) ("Staff Analysis").

[9] We also note that, even if it were proper to interpret 44 C.F.R. § 206.221(e) to require that all eligible facilities (including educational facilities) applying for assistance under the Act be open "to the general public," it is not entirely clear, in light of FEMA policy, why a school should be deemed to fail this requirement because it uses religious criteria as a basis for admission. In its Private Nonprofit Facility Eligibility Policy, FEMA states that an organization fails its "general public" requirement if "[m]embership" therein "excludes individuals of certain discrete groups." Policy No. 9521.3, ¶ 7.E.1.e (Apr. 25, 2000). On the other hand, an organization will "likely" satisfy the test if, *inter alia*, "[u]se restrictions, if any, are clearly related to the nature of the facility." *Id.* ¶ 7.E.2.d. The Policy goes on to provide examples of facilities limited to senior citizens, children's day care, and care for abused spouses, all of which presumptively satisfy the "general public" requirement. *Id.* ¶ 7.B.4.

In light of these examples, it appears that FEMA does not construe the "general public" requirement to require that facilities be open to *all* persons. Senior citizens' homes serve only elderly people, excluding the young and middle-aged; child care facilities serve only young people, excluding adults; facilities for abused spouses serve only abused married people, excluding those who are unmarried (and presumably those who are abused by people other than their spouses). It cannot be denied that these facilities "exclude[] individuals of certain discrete groups." Yet FEMA permits these facilities to receive aid notwithstanding the fact that they are not open to everyone, because their admission practices are "clearly related to the nature of the facility," which is to serve people with specific needs or backgrounds.

Insofar as the same can be said of a school that restricts admission to students of a particular faith— such restrictions on admission "are clearly related to the nature of the facility," which, in part, is to provide religious education—it is not evident why the Academy should be viewed as not providing services "to the general public" simply because it applies religious criteria in its admission practices and thus is not open to *everyone*. To the extent that the Acting Regional Director may have rested on the policy judgment that religious discrimination is more invidious than other types of discrimination, we note that the statute contains no such judgment and that many federal statutes permit religious organizations to preserve their autonomy by limiting their associations to co-religionists. *See* 42 U.S.C.A. § 2000e-1 (2000) (Title VII provision permitting religious nonprofit organizations to hire on a religious basis); *id.* § 2000d (Title VI provision prohibiting recipients of federal funding from discriminating on the basis of "race, color, or national origin," but not religion); 20 U.S.C.A. § 1681(a) (2000) (Title IX provision prohibiting federally funded educational institutions from discriminating on the basis of sex, but not religion).

schools that limit admission to students of a particular faith be deemed ineligible for disaster relief.[10]

## III.

You also asked us to analyze whether the Establishment Clause of the First Amendment would require another result. Although there is no precedent that directly controls this specific issue, we conclude that the Establishment Clause does not pose a barrier to FEMA's provision of a disaster assistance grant to the Academy. The aid that is authorized by federal law is made available on the basis of neutral criteria to an unusually broad class of beneficiaries defined without reference to religion and including not only educational institutions but a host of other public and private institutions as well. Moreover, the program's design is not characterized by the sort of administrative discretion that can readily be used to favor religion, and the evidence demonstrates that FEMA has exercised its

---

[10] Under 42 U.S.C.A. § 5151(b), which the Acting Regional Director did not cite, the President has authority to promulgate "regulations relating to nondiscrimination" that apply to institutions that receive FEMA disaster assistance. *See id.* ("As a condition of . . . receiving assistance under this chapter, . . . organizations shall be required to comply with regulations relating to nondiscrimination promulgated by the President . . . ."). The President, however, has not promulgated regulations prohibiting recipients of FEMA disaster assistance from discriminating on the basis of religion. *See* 44 C.F.R. § 7.920 (2001) (prohibiting recipients of assistance from discriminating on the basis of age, but not religion). Nor are we aware of any other provision of federal law that would impose such a requirement upon the Academy. *See* 20 U.S.C.A. § 1681(a) (2000) (Title IX) (prohibiting educational institutions from discriminating on the basis of sex, but not religion); 44 C.F.R. pt. 19 (2001) (implementing Title IX for purposes of FEMA assistance); 42 U.S.C.A. § 2000d (prohibiting recipients of federal funding from discriminating on the basis of "race, color, or national origin"); 44 C.F.R. § 7.3 (2001) (prohibiting recipients of FEMA assistance under various statutes from discriminating on the basis of "race, color, or national origin"); *see also* Staff Analysis at 2 (finding that the Academy complies with Title VI).

FEMA Director's Policy 2-01 provides that "[i]t is the policy of [FEMA] to ensure that the Civil Rights of all persons receiving services or benefits from agency programs and activities are protected" and that "[n]o person shall, on the grounds of . . . religion . . . be denied the benefits of, be deprived of participation in, or be discriminated against in any program or activity conducted by or receiving financial assistance from FEMA." *Id.*, *Re: Civil Rights Program*, ¶ 1 (July 17, 2001). *See also id.* ¶ 4 (explaining that these requirements apply to "educational institutions" that receive FEMA assistance). We note, however, that this policy has not been adopted by regulation, and thus cannot be said to implement 42 U.S.C.A. § 5151(b). Nor are we aware of any other statutory authority that would authorize FEMA to impose a "general public" or religious nondiscrimination requirement on the Academy. Sections 5164 and 5201(a)(1) of title 42 (2000) authorize the President to "prescribe such rules and regulations as may be necessary and proper to carry out any of the provisions of this chapter," but we are doubtful that those provisions would permit FEMA to impose a "general public" require-ment where Congress, in the statutory provision that speaks directly to the question, has imposed such a requirement on *other* institutions but not on educational institutions such as the Academy. *See* 42 U.S.C.A. § 5122(9). Similarly, there is some question whether these provisions would authorize FEMA to adopt a "policy" imposing a religious nondiscrimination requirement upon participating institutions where another provision of the same statute (42 U.S.C.A. § 5151(b)) mandates that such requirements be imposed pursuant to "regulations."

discretion in a neutral manner. Thus, we believe that provision of disaster assistance to the Academy cannot be materially distinguished from aid programs that are constitutional under longstanding Supreme Court precedent establishing that religious institutions are fully entitled to receive generally available government benefits and services, such as fire and police protection.

The Supreme Court's general framework for analyzing Establishment Clause issues is familiar. A statute violates the Establishment Clause if it lacks a "secular legislative purpose," has a "primary effect" of advancing religion, or results in an "excessive entanglement" between government and religion. *See Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971); *see also Agostini v. Felton*, 521 U.S. 203 (1997) (reformulating the *Lemon* test by incorporating its "entanglement" prong into its "effects" prong). Here, as in the vast majority of situations implicating the Establishment Clause, the critical question is whether allowing the Academy to receive direct disaster assistance would have the "primary effect" of advancing religion.[11] Accordingly, our analysis will focus on decisions that illuminate that inquiry.

Ever since its first modern Establishment Clause decision in *Everson v. Board of Education*, 330 U.S. 1, 17 (1947), the Supreme Court has indicated that religious institutions are entitled to receive "general government services" made available on the basis of neutral criteria. *Everson* held that the Establishment Clause does not bar students attending religious schools from receiving generally available school busing services provided by the government. In reaching its decision, the Court explained that even if the evenhanded provision of busing services increased the likelihood that some parents would send their children to religious schools, the same could be said of other "general state law benefits" that were *even more clearly constitutional* because they were equally available to all citizens and far removed from the religious function of the school. *Id*. at 16. As examples, the Court cited "such general government services as ordinary police and fire protection, connections for sewage disposal, public highways and sidewalks," concluding:

---

[11] It is clear that allowing a range of nonprofit organizations like the Academy to receive rehabilitation grants serves the secular purpose of rehabilitating the community by helping to rebuild institutions that perform quasi-public functions and are (by virtue of their nonprofit status) most in need of assistance. *See* Pub. L. No. 92-385, § 4, 86 Stat. at 556-57 (explaining that disaster relief for private, nonprofit educational facilities was appropriate because such institutions "have a secular educational mission," and because the public schools would have to bear the cost of educating the students attending such private schools if the damaged institutions were not restored); *see also* 57 Fed. Reg. 18,441 (1992) (preamble to FEMA proposed rule explaining that the 1972 statute permitted grants to private schools "because of the public function which they served"). Nor is there any basis for concluding that allowing the Academy to receive aid would "excessively entangle" the Academy with the state, as there is even less governmental monitoring of aid recipients here than in other cases in which the Court has not questioned the provision of aid under *Lemon*'s entanglement prong. *Cf., e.g.*, *Agostini*, 521 U.S. 203; *Mitchell v. Helms*, 530 U.S. 793 (2000).

cutting off church schools from these services, so separate and so indisputably marked off from the religious function, would make it far more difficult for the schools to operate. But such is obviously not the purpose of the First Amendment. That Amendment requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary. State power is no more to be used so as to handicap religions, than it is to favor them.

*Id*. at 17-18. *See also id*. at 16 ("[The state] cannot exclude individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Non-believers, Presbyterians, or the members of any other faith, *because of their faith, or lack of it*, from receiving the benefits of public welfare legislation. . . . [W]e must be careful, in protecting the citizens of New Jersey against state-established churches, to be sure that we do not inadvertently prohibit New Jersey from extending its general state law benefits to all its citizens without regard to their religious belief").

We believe that a FEMA disaster assistance grant is analogous to the sort of aid that qualifies as "general government services" approved by the Court in *Everson*. Although such aid is not available to *all* citizens or buildings—and thus is not as broadly available as, say, utility services—neither is it limited to educational institutions or, for that matter, to just a few classes of buildings. As noted above, the FEMA grants in question are made available not only to public and private schools, but to "private nonprofit . . . utility, irrigation, emergency, medical, rehabilitational, and temporary or permanent custodial care facilities (including those for the aged and disabled), other private nonprofit facilities which provide essential services of a governmental nature to the general public, and facilities on Indian reservations as defined by the President." 42 U.S.C.A. § 5122(9). Accordingly, we think that the "circumference" of this program can fairly be said to "'encircle[] a class so broad that it can be fairly concluded that religious institutions could be thought to fall within the natural perimeter.'" *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 17 (1989) (plurality opinion) (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 696 (1970) (Harlan, J.)). As the Court stated in *Widmar v. Vincent*, 454 U.S. 263, 274 (1981), "[t]he provision of benefits to so broad a spectrum of groups is an important index of secular effect." *Accord Texas Monthly*, 489 U.S. at 14-15 (plurality opinion) (footnote omitted) ("[i]nsofar as [a] subsidy is conferred upon a wide array of nonsectarian groups as well as religious organizations in pursuit of some legitimate secular end, the fact that religious groups benefit incidentally does not deprive the subsidy of the secular purpose and primary effect mandated by the Establishment Clause"); *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 8 (1993) ("we have consistently held that government programs that neutrally provide benefits to a broad class of citizens defined without reference to religion are not readily subject to an Establishment Clause challenge"); *Board of*

*Educ. of Kiryas Joel v. Grumet*, 512 U.S. 687, 704 (1994) ("we have frequently relied explicitly on the general availability of any benefit provided religious groups or individuals in turning aside Establishment Clause challenges").

In *Walz v. Tax Commission*, 397 U.S. 664, 673 (1970), for example, the Court rejected an Establishment Clause challenge to a property tax exemption made available not only to churches, but to several other classes of nonprofit institutions, such as "hospitals, libraries, playgrounds, scientific, professional, historical, and patriotic groups." *See also id.* at 667 n.1. In upholding the program, the Court relied in part upon the breadth of the tax exemption: the exemption did "not single[] out one particular church or religious group or even churches as such," but rather was available to "a broad class of property owned by nonprofit, quasi-public corporations." *Id.* at 673. As the Court stated in reference to *Everson*, if "buses can be provided to carry and policemen to protect church school pupils, we fail to see how a broader range of police and fire protection given equally to all churches, along with nonprofit hospitals, art galleries, and libraries receiving the same tax exemption, is different for purposes of the Religion Clauses." *Id.* at 671. Thus, just as a broad category of beneficiary institutions was sufficient to sustain the inclusion of religious institutions in the tax benefit in *Walz*, we believe the breadth of the eligibility categories in the FEMA program is sufficient to sustain the provision of FEMA aid to the Academy. Put another way, we do not think that providing FEMA grants to religious institutions that qualify for disaster relief on the basis of wholly neutral criteria—a wide array of nonprofit organizations may receive aid for buildings that have suffered structural damage from a natural disaster—lacks a secular purpose or effect. *See generally Lemon*, 403 U.S. at 612-13; *Agostini*, 521 U.S. at 223-30.

We cannot say, however, that there are no arguments to the contrary. Most important, there is an argument that providing FEMA disaster relief to repair a school used for religious instruction would run afoul of Supreme Court precedent restricting the use of "direct" aid that can be put to specifically religious uses. In particular, one might argue that insofar as the grant used to rebuild the Academy's building would ultimately support the building's use for secular *and* religious purposes—i.e., both secular and religious teaching—such aid is unlawful under Supreme Court decisions from the 1970s holding that public construction grants for educational institutions may not be applied toward buildings used for religious purposes. *See Tilton v. Richardson*, 403 U.S. 672 (1971) (federal construction grants for college and university facilities must be restricted indefinitely to use for secular purposes); *Committee for Pub. Educ. v. Nyquist*, 413 U.S. 756 (1973) (invalidating the provision of state maintenance and repair grants to religious schools on the basis that such aid could not be restricted to secular purposes); *see also Hunt v. McNair*, 413 U.S. 734, 744 (1973) (sustaining state financing of construction for religious college under program that barred financing of "buildings or facilities used for religious purposes").

In *Tilton*, for example, the Court sustained the provision of federal construction grants to religious colleges insofar as the program at issue barred aid for "'any facility used or to be used for sectarian instruction or as a place for religious worship,'" but invalidated such grants insofar as the program permitted funding the construction of buildings that might someday be used for religious activities. *See* 403 U.S. at 675, 683 (plurality opinion) (citations omitted) (concluding that a 20-year limitation on the statutory prohibition on use of the buildings for religious activities violated the Establishment Clause, because "[i]f, at the end of 20 years, the building is, for example, converted into a chapel or otherwise used to promote religious interests, the original federal grant will in part have the effect of advancing religion").[12] Similarly, in *Nyquist* the Court invalidated state maintenance and repair grants for nonpublic elementary and secondary schools because it was not possible to "restrict payments to those expenditures related to the upkeep of facilities used exclusively for secular purposes." 413 U.S. at 774. These portions of the holdings of these decisions, so far as they go, have not been specifically overruled, even where government aid is distributed to both religious and nonreligious schools on the basis of neutral criteria.[13]

---

[12] This portion of the holding in *Tilton* was unanimous. *See also id.* at 692 (Douglas, J., dissenting in part, joined by Black and Marshall, JJ.); *Lemon*, 403 U.S. at 659-61 (separate opinion of Brennan, J., concurring in judgment in part in *Tilton*); *id.* at 665 & n.1 (White, J., concurring in judgment in *Tilton*) ("accept[ing] the Court's invalidation of the provision in the federal legislation whereby the restriction on the use of buildings constructed with federal funds terminates after 20 years").

[13] *See Mitchell*, 530 U.S. at 840 (O'Connor, J., concurring in the judgment) ("Although '[o]ur cases have permitted some government funding of secular functions performed by sectarian organizations,' our decisions 'provide no precedent for the use of public funds to finance religious activities'" (citation omitted)); *see also id.* (where government has given aid directly to a religious institution, "diversion of secular government aid to religious indoctrination" is "constitutionally impermissible"); *id.* at 865 (the principle that "'*any* use of public funds to promote religious doctrines violates the Establishment Clause,' . . . of course remains good law" (citation omitted)); *id.* at 856-57 (discussing *Tilton*); *id.* at 857 (if plaintiffs were to prove "that the aid in question actually is, or has been, used for religious purposes," they would "establish a First Amendment violation"); *id.* at 843-44 (emphasizing that the constitutional concern that direct aid might be impermissibly diverted to religious activities is especially pronounced when the aid is in the form of direct monetary subsidies).

We would also note, however, that while the relevant holdings of these cases have not been overruled, significant portions of their reasoning is subject to serious question in light of more recent decisions. Separate portions of the *Nyquist* decision, for example, were overruled by the Court last Term in *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002), and the "pervasively sectarian" doctrine, which comprised the basis for many of the Court's Establishment Clause decisions in the early 1970s (including *Nyquist*, 413 U.S. at 774-75), no longer enjoys the support of a majority of the Court. *See Mitchell*, 530 U.S. at 825-29 (plurality opinion); *id.* at 857-58 (O'Connor, J., concurring in judgment) (requiring proof of *actual* diversion of public support to religious uses to invalidate direct aid to schools and explaining that "presumptions of religious indoctrination are normally inappropriate when evaluating neutral school-aid programs under the Establishment Clause"); *Columbia Union College v. Oliver*, 254 F.3d 496, 502-04 (4th Cir. 2001) (explaining that the pervasively sectarian test is no longer valid in light of the holdings of six Justices in *Mitchell*). Moreover, even if decisions such as *Tilton* and *Nyquist* were controlling, they would limit the provision of a construction grant to the Academy only

Assuming, *arguendo*, that *Tilton* and *Nyquist* remain valid precedents in these respects, we do not believe that those decisions control the question whether FEMA may provide a disaster assistance grant to the Academy. In *Nyquist*, the Court distinguished fire and police services from construction grants and repair aid on the ground that police and fire protection are "provided in common to all citizens, are 'so separate and so indisputably marked off from the religious function,' that they may fairly be viewed as reflections of a neutral posture toward religious institutions." 413 U.S. at 782 (citation omitted). But we see no principled reason why the constitutionality of an aid program should turn on whether the aid is provided to *all* citizens rather than, say, a wide array of organizations that falls somewhat short of the entire populace. There is a range of aid programs that are not as "general" as aid provided universally (to *every* person), but yet are not as circumscribed as aid to education,[14] and the grants provided by FEMA admittedly fall somewhere within this middle ground. But such aid is more closely analogous to the provision of "general" government services like those sanctioned by the Court in *Everson* (and many times since, e.g., *Nyquist*, 403 U.S. at 781-82) than to the construction grants at issue in *Tilton* and *Nyquist*, which were available only to educational institutions.

The vast majority of the Supreme Court's Establishment Clause decisions rendered since *Everson* have concerned aid provided solely to educational institutions as a class (in many cases, moreover, this aid was directed toward the educational process itself), and these decisions rest in part on the theory that aid directed solely to schools is reasonably perceived as advancing the educational mission of those that receive it. *See, e.g.*, *Mitchell v. Helms*, 530 U.S. 793, 843

insofar as the grant would be used to reconstruct those portions of buildings in which specifically religious activities take place.

In a prior memorandum, *Constitutionality of Awarding Historic Preservation Grants to Religious Properties*, 19 Op. O.L.C. 267 (1995) ("Historic Preservation Memo"), this Office concluded that *Tilton* and *Nyquist* prohibited the Interior Department from providing historic preservation grants to religious properties. That opinion did not consider whether the rule of *Tilton* and *Nyquist* should apply where the grants at issue are available to a wide array of nonprofit institutions, rather than being limited to educational institutions. Moreover, the Historic Preservation Memo relied heavily on the fact that qualification for historic preservation grants depended on the application of "subjective criteria," such as historical importance, in determining "project worthiness." *Id.* at 271-72. We continue to believe that the degree of discretion exercised by governmental officials, and the manner in which such discretion is exercised, are relevant to the constitutionality of direct aid programs (although we express no opinion here on the Memo's conclusion regarding historic preservation grants). But to the extent that the Historic Preservation Memo failed to consider the possibility that the rule of *Tilton* and *Nyquist* does not apply where direct aid is more generally available than was the aid in those cases, it does not represent our current thinking, which is set forth in this memorandum.

[14] *See Mitchell*, 530 U.S. at 875 (Souter, J., dissenting) (stating that "government spending resists easy classification as between universal general service or subsidy of favoritism," and noting that "[t]he 5-to-4 division of the *Everson* Court turned on the inevitable question whether reimbursing all parents for the cost of transporting their children to school was close enough to police protection to tolerate its indirect benefit in some degree to religious schools").

(2000) (O'Connor, J., concurring in judgment). The argument that direct aid to education unlawfully advances the mission of religious schools applies with the greatest force where such schools constitute a substantial percentage of those that receive aid. *See Lemon*, 403 U.S. at 610 (noting that 96% of students at recipient institutions were pupils at religious schools and that "most" of those schools were Catholic); *Nyquist*, 413 U.S. at 768 ("all or practically all" of the schools eligible for maintenance or repair grants were Catholic, and 85% of those eligible for other forms of aid were church-affiliated); *Meek v. Pittenger*, 421 U.S. 349, 364 (1975) ("more than 75% [of the qualifying schools] are church-related or religiously affiliated educational institutions"), *overruled in relevant part by Mitchell*, 530 U.S. 793; *Wolman v. Walter*, 433 U.S. 229, 234 (1977) (of 720 private schools eligible for aid, "all but 29" were religious), *overruled in relevant part by Mitchell*, 530 U.S. 793.[15] That argument is much harder to make where the aid is provided to a range of nonprofit institutions of which schools are but one part. The broad class of beneficiaries that are eligible for aid under the statute here—which includes "educational, utility, irrigation, emergency, medical, rehabilitational, and temporary or permanent custodial care facilities (including those for the aged and disabled), other private nonprofit facilities which provide essential services of a governmental nature to the general public, and facilities on Indian reservations," 42 U.S.C.A. § 5122(9)—confirms that, in contrast to the education-specific aid at issue in the foregoing cases, the disaster relief provided by FEMA serves goals entirely unrelated to education—namely, rehabilitation of a community that has suffered great loss from a natural disaster by helping to rebuild institutions that perform quasi-public functions and are (by virtue of their nonprofit status) most in need of assistance. *Cf. Mitchell*, 530 U.S. at 883 (Souter, J., dissenting) ("[D]epending on the breadth of distribution, looking to evenhandedness is a way of asking whether a benefit can reasonably be seen to aid religion in fact; we do not regard the postal system as aiding religion, even though parochial schools get mail").

---

[15] We are not suggesting that an aid program has the unlawful effect of advancing religion merely because a large number of its beneficiaries are religious in nature. The Supreme Court has repeatedly repudiated the view that the percentage of a program's religious beneficiaries is relevant to its constitutionality under the Establishment Clause. *See Mueller v. Allen*, 463 U.S. 388, 391, 401 (1983) (sustaining a tax deduction for educational expenses made available to both religious and secular parents, notwithstanding evidence that "about 95%" of eligible beneficiaries were parents whose children attended religious schools); *Agostini v. Felton*, 521 U.S. 203, 229 (1997) (noting that the Court was not "willing to conclude that the constitutionality of an aid program depends on the number of sectarian school students who happen to receive the otherwise neutral aid"); *Mitchell*, 530 U.S. at 812 n.6 (plurality opinion) (citing *Agostini* for the proposition that "the proportion of aid benefiting students at religious schools pursuant to a neutral program involving private choices [is] irrelevant to the constitutional inquiry"); *Zelman*, 536 U.S. at 658 (refusing to "attach constitutional significance to the fact that 96% of scholarship recipients have enrolled in religious schools" and stating that "[t]he constitutionality of a neutral educational aid program simply does not turn on whether and why, in a particular area, at a particular time, most private schools are run by religious organizations").

We find further support for our decision in the fact that *Tilton* and *Nyquist* are in considerable tension with a long and growing line of cases holding that the Free Speech Clause does not permit the government to deny religious groups equal access to *the government's own property*, even where such groups seek to use the property "'for purposes of religious worship or religious teaching.'" *Widmar v. Vincent*, 454 U.S. 263, 265 (1981). *See Lamb's Chapel v. Center Moriches Sch. Dist.*, 508 U.S. 384, 394 (1993); *Capital Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753 (1995); *Good News Club v. Milford Central Sch.*, 533 U.S. 98 (2001); *see also Board of Educ. v. Mergens*, 496 U.S. 226 (1990). Providing religious groups with access to property is a form of direct aid—albeit not financial aid—and allowing such groups to conduct worship services plainly "advances" their religious mission. The Court, however, has consistently refused to *permit* (let alone require) state officials to deny churches equal access to public school property "on the ground that to permit its property to be used for religious purposes would be an establishment of religion." *Lamb's Chapel*, 508 U.S. at 394. Indeed, the Court has gone so far as to extend the reasoning of these cases to require equal *funding* of religious student expression, reasoning that "[e]ven the provision of a meeting room . . . involve[s] governmental expenditure" for "upkeep, maintenance, and repair of the facilities." *See Rosenberger v. Rector of Univ. of Virginia*, 515 U.S. 819, 842-43 (1995); *see also Prince ex rel. Prince v. Jacoby*, No. 99-35490, 2002 WL 31007791, at *16-*18 (9th Cir. Sept. 9, 2002) (extending the principles of *Rosenberger* to monetary and other benefits provided to student groups that are entitled to meet on school grounds under the Equal Access Act).

As in *Rosenberger*, the issue here "lies at the intersection of the principle of government neutrality and the prohibition on state funding of religious activities." 515 U.S. at 846 (O'Connor, J., concurring). In such a case, "[r]eliance on categorical platitudes," such as an absolute "no direct aid" principle, "is unavailing." *Id.* at 847. Accordingly, we do not think it would be appropriate to conclude that the *Tilton-Nyquist* decisions govern the constitutionality of allowing a religious school to receive disaster assistance on the same terms as a wide array of institutions that provide a public service, whether they are educational or non-educational, secular or religious. If the diversity of recipients in *Walz* and the "equal access" line of cases was sufficient to dispel any Establishment Clause problems, we see no reason why a similar array of recipients in the FEMA program should not likewise suffice to sustain it. *See also Zelman v. Simmons-Harris*, 536 U.S. 639, 727 (2002) (Breyer, J., dissenting) (arguing that establishment concerns are "far more" implicated by "government involvement in religious primary education" than by "tax deductions for charitable contributions," which "come far closer to exemplifying the neutrality that distinguishes, for example, fire protection on the one hand from direct monetary assistance on the other"). Accordingly, we conclude that the

FEMA assistance here is more analogous to the police and fire services discussed in *Everson* than to the educational assistance at issue in *Tilton* and *Nyquist*.[16]

For similar reasons, we do not believe that a reasonable observer would perceive an endorsement of religion in the government's evenhanded provision of aid to a religious school damaged by an earthquake. *See Mitchell*, 530 U.S. at 842-44 (O'Connor, J., concurring in judgment).[17] In a direct aid program limited to *educational* recipients, one could argue that if a school "uses the aid to inculcate religion in its students, it is reasonable to say that the government has communicated a message of endorsement." *Id*. at 843 (O'Connor, J.). The notion is that, where the government provides education-specific aid, it is fair to say that the government is providing the assistance because of the content of the funded education. Such a presumption of governmental endorsement is not present, however, where the aid is provided to a wide array of nonprofit institutions (educational and noneducational alike), where the aid is not provided because of the content of any activities that take place within the building, and where the government is indifferent to the religious or secular orientation of any education that may occur within the building. Indeed, much of the aid here is given to nonprofit institutions that provide services that do not involve any "pedagogy" or "speech" whatsoever.[18]

Our conclusion is strongly supported by the evidence regarding FEMA's application of the criteria for receiving funds under the Act. Apart from the Academy,

---

[16] We acknowledge, as Justice O'Connor noted in her concurrence in *Mitchell*, 530 U.S. at 840, that the Court has never approved of any direct financial assistance to religious institutions absent assurance that the aid may not lawfully be diverted to religious activities, and the Court's cases contain rhetoric to the effect that "'*any* use of public funds to promote religious doctrines violates the Establishment Clause.'" *Id.* at 865 (quoting *Bowen v. Kendrick*, 487 U.S. 589, 623 (1988) (O'Connor, J., concurring)). At the same time, however, the Court has never passed on a program in which direct financial aid was extended to schools as part of a broader array of public and private institutions.

[17] *See generally County of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573, 592 (1989) (the Court has, "[i]n recent years, . . . paid particularly close attention to whether the challenged governmental practice either has the purpose or effect of 'endorsing' religion"); *see also id.* at 624-32 (O'Connor, J., concurring in part and concurring in the judgment); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 307-08 (2000); *Agostini*, 521 U.S. at 235.

[18] One could also argue that fire protection is distinguishable from disaster assistance in that the latter is a more "substantial" form of aid that permits the construction of an entire facility, whereas fire protection merely prevents such a facility from being destroyed. We do not find this argument persuasive, however. To begin with, the Supreme Court's decisions decreasingly focus on the "substantiality" of aid provided to religious institutions. *See, e.g., Agostini*, 521 U.S. at 205 (rejecting the rule "that all government aid that directly aids the educational function of religious schools is invalid"); *Mitchell*, 530 U.S. at 820-25 (plurality opinion); *id.* at 849-57 (O'Connor, J., concurring in judgment); *Zelman*, 536 U.S. 639. Moreover, we think it would "exalt form over substance" (*Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 13 (1993)) to say that the government may provide aid that helps a religious organization *avoid* a disaster but not aid that would help such an organization *recover from* a disaster.

of the 268 Nisqually Earthquake applications on which FEMA has ruled,[19] 267 applicants—all but *one*—were declared eligible for funding. *See* Exhibit A. It thus appears that there is little exercise of discretion regarding religion in the distribution of grant funds—indeed, in this instance, funding was virtually automatic—and the diverse makeup of those that have received funds confirms that the program's administration is not "skewed towards religion." *Witters v. Washington Dep't of Servs.*, 474 U.S. 481, 488 (1986). This largely (if not entirely) eliminates any "special risks" that direct aid "will have the effect of advancing religion (or, even more, a purpose of doing so)." *Mitchell*, 530 U.S. at 819 n.8 (plurality opinion). An examination of the array of institutions funded by FEMA confirms that the program is neutral in practice. Of the funded institutions, 245 are public facilities, while only 22 are private nonprofit facilities. The public facilities include, among other things, schools and school districts (of which there are 63), fire stations, libraries, prisons, utilities, and buildings that provide public social services. The private facilities likewise include a broad array of institutions— hospitals and other health facilities, low income housing centers, social services organizations, and even a "maritime discovery center."[20] Judging from the names of the private organizations, moreover, it appears that only a handful have religious affiliations.[21] In sum, the record reveals no basis for concern that FEMA

---

[19] FEMA received 336 applications for funding in response to the Nisqually Earthquake, 68 of which were withdrawn. We are informed that FEMA does not keep records of the reasons for withdrawn applications, and that FEMA does not generally know why applications are withdrawn. Thus, the record does not reflect the reasons for the withdrawals of these applications. Nonetheless, we note that of these 68 withdrawn applications, 61 were withdrawn by public institutions and seven were withdrawn by private nonprofit facilities. Thus, an almost identical percentage of public entity applications (22.22%) and private nonprofit facility applications (23.33%) were withdrawn. In addition, nothing in the record suggests that these withdrawals, to the extent that they were motivated by FEMA's actions at all, were based on any effort to skew the program in favor of religion, or that FEMA considered the content of activities that take place within the buildings for which construction and repair funds were sought. Moreover, FEMA personnel have informed us that the basis for any withdrawals prompted by the agency would have been purely objective, neutral, and statutory.

[20] The private nonprofit facilities that received funding from FEMA as a result of the Nisqually Earthquake are as follows: (1) Bayview Manor Foundation ($2,008); (2) Bread of Life Mission Association ($23,463); (3) Community Health Centers of King County ($11,910); (4) Graham Hill Mutual Water Company ($36,594); (5) Group Health Cooperative of Puget Sound ($87,522); (6) Interim Housing Association ($6,885); (7) Kitsap Mental Health Services ($6,718); (8) Lake Alice Water Association ($33,345); (9) Madrona Beach Water Company, Inc. ($42,043); (10) Meridian Heights Water District ($7,048); (11) Odyssey, The Maritime Discovery Center ($15,768); (12) Pinewood Glen Improvement Club ($2,911); (13) Pioneer Human Services ($163,708); (14) Plymouth Housing Group ($4,190); (15) Providence Health System ($212,543); (16) Recovery Centers of King County ($2,866); (17) Safe Homes ($35,942); (18) Seattle Indian Health Board ($48,463); (19) The Compass Center ($1,649,068); (20) The Low Income Housing Institute ($543,553); (21) View Ranch Estates Water Association ($1,286); (22) Virginia Mason Medical Center ($2,831,474).

[21] *See* Exhibit A, No. 23 (Bread of Life Mission Association), No. 336 (YMCA of Greater Seattle). It is our understanding that the application of the Archdiocesan Housing Authority ("AHA") was initially denied (Exhibit A, No. 9) on the basis that the AHA had not yet applied for a loan from the Small Business Administration ("SBA"). The AHA subsequently did apply for such a loan, however,

administrators have discretion to favor religious applicants, or that those administrators have exercised what little discretion they do have in a manner that favors religion.

Finally, we would emphasize that although there is some risk that a court would invalidate the provision of disaster assistance to the Academy—decisions under the Establishment Clause are notoriously context-dependent and difficult to predict—the facts provide an especially strong case for arguing that direct aid to religious educational institutions is constitutional where made available on the basis of genuinely neutral criteria, to an array of beneficiaries including both educational *and* non-educational institutions. Indeed, there are arguments that excluding religious organizations from disaster assistance made available to similarly situated secular institutions would violate the Free Exercise Clause and the Free Speech Clause. *E.g.*, *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 532 (1993) ("[a]t a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs"); *Employment Div. v. Smith*, 494 U.S. 872, 877 (1990) (under the Free Exercise Clause, the state may not "impose special disabilities on the basis of religious views or religious status"); *Rosenberger*, 515 U.S. at 828 ("the government offends the First Amendment when it imposes financial burdens on certain speakers based on the content of their expression," including religious expression).[22] Moreover, four members of the Supreme Court have made clear that they would sustain any program of aid that provides secular assistance, on the basis of neutral criteria, to religious and secular schools alike, *see Mitchell*, 530 U.S. at 807-14 (plurality opinion), which is a narrower view of the Establishment Clause than would be required to sustain the provision of FEMA aid to the Academy.

JAY S. BYBEE
*Assistant Attorney General*
*Office of Legal Counsel*

---

and its application was denied. Thus, its application is in the process of being reinstated. If the AHA's application is granted, it appears that not a single applicant that meets the objective criteria for funding under the Act will have been denied eligibility for funding.

[22] In July, for example, the Ninth Circuit—which might well hear any appeal involving a challenge to the provision of disaster assistance to the Academy here—held that the State of Washington violated the Free Exercise Clause of the First Amendment in denying public scholarship assistance to an otherwise eligible college student on the ground that he intended to use the scholarship to pursue a degree in theology. *See Davey v. Locke*, 299 F.3d 748 (9th Cir. 2002). There is an argument here, too, that denying aid to the Academy solely on account of their religious faith would violate the Free Exercise Clause.

Editor's Note: The Ninth Circuit's decision in *Davey v. Locke* was subsequently reversed by *Locke v. Davey*, 540 U.S. 712 (2004). In that decision, the Supreme Court ruled that the State of Washington could decide not to fund instruction in devotional theology without violating the Free Exercise Clause, because of the State's "antiestablishment interest[]" in not "using tax funds to support the ministry," for which there was a long tradition of state constitutional prohibition. *Id.* at 722, 723.

**Exhibit A**

**Applications Received by FEMA in Response to the Nisqually Earthquake**

| No | Disaster | Applicant Name | Pnp | Elig | Grant Amt |
|----|----------|----------------|-----|------|-----------|
| 1 | 1361 | Aberdeen School District | N | Y | $13,097 |
| 2 | 1361 | Aberdeen, City of | N | Y | Withdrawn |
| 3 | 1361 | Adna School District No. 226 | N | Y | $16,203 |
| 4 | 1361 | Alder Mutual Light Co | N | Y | Withdrawn |
| 5 | 1361 | Allyn, Port of | N | Y | $2,078 |
| 6 | 1361 | Anacortes School District No. 103 | N | Y | $39,610 |
| 7 | 1361 | Anacortes, City of | N | Y | $7,958 |
| 8 | 1361 | Annapolis Water District | N | Y | $24,254 |
| 9 | 1361 | Archdiocesan Housing Authority | Y | N | Applicant in Process of Being Reinstated |
| 10 | 1361 | Auburn School District No. 408 | N | Y | Withdrawn |
| 11 | 1361 | Bainbridge Island, City of | N | Y | $2,458 |
| 12 | 1361 | Bates Technical College | N | Y | Withdrawn |
| 13 | 1361 | Bayview Manor Foundation | Y | Y | $2,008 |
| 14 | 1361 | Beaux Arts Village, Town of | N | Y | Withdrawn |
| 15 | 1361 | Bellevue Community College | N | Y | $1,227 |
| 16 | 1361 | Bellevue, City of | N | Y | $230,382 |
| 17 | 1361 | Bethel School District No. 403 | N | Y | $341,435 |
| 18 | 1361 | Black Diamond City Fire Department | N | Y | Withdrawn |
| 19 | 1361 | Black Diamond, City of | N | Y | $3,201 |
| 20 | 1361 | Blaine School District No. 503 | N | Y | $16,100 |
| 21 | 1361 | Boistfort Valley Water Corporation | Y | Y | Withdrawn |
| 22 | 1361 | Bothell, City of | N | Y | $470 |
| 23 | 1361 | Bread of Life Mission Association | Y | Y | $23,463 |
| 24 | 1361 | Bremerton School District | N | Y | $101,876 |
| 25 | 1361 | Bremerton, City of | N | Y | $425,016 |
| 26 | 1361 | Bridgeport School District | N | Y | $15,515 |
| 27 | 1361 | Bucoda, Town of | N | Y | $3,141 |
| 28 | 1361 | Burien, City of | N | Y | $18,195 |
| 29 | 1361 | Capitol Hill Housing Improvement Program | N | Y | $70,348 |

| No | Disaster | Applicant Name | Pnp | Elig | Grant Amt |
|----|----------|----------------|-----|------|-----------|
| 30 | 1361 | Carbonado Historical School District | N | Y | $59,799 |
| 31 | 1361 | Carnation, City of | N | Y | $3,305 |
| 32 | 1361 | Cascadia Community College | N | Y | Withdrawn |
| 33 | 1361 | Castle Rock School District No. 401 | N | Y | Withdrawn |
| 34 | 1361 | Cedar Glen Community | Y | Y | Withdrawn |
| 35 | 1361 | Cedar River Water & Sewer District | N | Y | $26,634 |
| 36 | 1361 | Central Kitsap Fire & Rescue | N | Y | $20,595 |
| 37 | 1361 | Central Kitsap School District No. 401 | N | Y | Withdrawn |
| 38 | 1361 | Centralia College | N | Y | $9,006 |
| 39 | 1361 | Centralia Public School District No. 401 | N | Y | $29,431 |
| 40 | 1361 | Centralia, City of | N | Y | $42,326 |
| 41 | 1361 | Chehalis School District No. 302 | N | Y | $255,888 |
| 42 | 1361 | Chehalis Tribe | N | Y | $25,819 |
| 43 | 1361 | Chehalis, City of | N | Y | $34,119 |
| 44 | 1361 | Clallam County Fire District No. 3 | N | Y | $3,939 |
| 45 | 1361 | Clear Lake Water District | N | Y | $8,402 |
| 46 | 1361 | Clover Park School District | N | Y | $25,532 |
| 47 | 1361 | Clover Park Technical College | N | Y | Withdrawn |
| 48 | 1361 | Community Health Centers of King County | Y | Y | $11,910 |
| 49 | 1361 | Cosmopolis | N | Y | $10,452 |
| 50 | 1361 | Covington Water District | N | Y | $3,880 |
| 51 | 1361 | Cowlitz Cnty Fire Protection District No. 3 | N | Y | $796 |
| 52 | 1361 | Darrington School District | N | Y | $25,253 |
| 53 | 1361 | Darrington, Town of | N | Y | Withdrawn |
| 54 | 1361 | Department of Corrections | N | Y | $1,518,881 |
| 55 | 1361 | Department of Labor & Industries | N | Y | $238,105 |
| 56 | 1361 | Department of Licensing | N | Y | $0 |
| 57 | 1361 | Department of Social & Health Services | N | Y | $2,652,973 |
| 58 | 1361 | Department of Veterans Affairs | N | Y | $16,936 |
| 59 | 1361 | Dept. of Community, Trade, & Economic Dev. | N | Y | $14,584 |
| 60 | 1361 | Des Moines, City of | N | Y | $32,669 |
| 61 | 1361 | Dieringer School District No. 343 | N | Y | $17,988 |
| 62 | 1361 | Eastside Fire & Rescue | N | Y | $4,869 |
| 63 | 1361 | Eatonville School District No. 404 | N | Y | Withdrawn |
| 64 | 1361 | Eatonville, City of | N | Y | $69,084 |

| No | Disaster | Applicant Name | Pnp | Elig | Grant Amt |
|----|----------|----------------|-----|------|-----------|
| 65 | 1361 | Elma, City of | N | Y | $917 |
| 66 | 1361 | Employment Security Department | N | Y | $34,227 |
| 67 | 1361 | Enumclaw School District | N | Y | $24,770 |
| 68 | 1361 | Everett Community College | N | Y | Withdrawn |
| 69 | 1361 | Everett, City of | N | Y | $30,603 |
| 70 | 1361 | Evergreen State College | N | Y | $350,537 |
| 71 | 1361 | Everson, City of | N | Y | $1,653 |
| 72 | 1361 | Federal Way Fire Dept. | N | Y | $2,508 |
| 73 | 1361 | Federal Way Public Schools | N | Y | $44,060 |
| 74 | 1361 | Ferndale School District | N | Y | $19,895 |
| 75 | 1361 | Fife School District | N | Y | $21,587 |
| 76 | 1361 | Fife, City of | N | Y | $25,078 |
| 77 | 1361 | Fircrest, City of | N | Y | $8,879 |
| 78 | 1361 | Franklin Pierce School District | N | Y | $16,758 |
| 79 | 1361 | Gig Harbor, City of | N | Y | Withdrawn |
| 80 | 1361 | Graham Hill Mutual Water Co | Y | Y | $36,594 |
| 81 | 1361 | Grays Harbor Community Hospital | Y | Y | Withdrawn |
| 82 | 1361 | Grays Harbor Fire Protection District No. 2 | N | Y | $7,867 |
| 83 | 1361 | Grays Harbor, County | N | Y | $44,406 |
| 84 | 1361 | Green River Community College | N | Y | $283,842 |
| 85 | 1361 | Group Health Cooperative of Puget Sound | Y | Y | $87,522 |
| 86 | 1361 | Highline Community College | N | Y | $8,385 |
| 87 | 1361 | Highline School District No. 401 | N | Y | $465,625 |
| 88 | 1361 | Highline Water District | N | Y | $40,272 |
| 89 | 1361 | Historic Seattle Preservation Development Auth. | N | Y | $202,594 |
| 90 | 1361 | Hoquiam, City of | N | Y | $15,483 |
| 91 | 1361 | Housing Authority of Clallam County | N | Y | $1,566 |
| 92 | 1361 | Housing Authority of Seattle | N | Y | $63,819 |
| 93 | 1361 | Housing Authority of Tacoma | N | Y | Withdrawn |
| 94 | 1361 | Housing Resources Group | Y | Y | Withdrawn |
| 95 | 1361 | Interim Housing Association | Y | Y | $6,885 |
| 96 | 1361 | Issaquah, City of | N | Y | $110,792 |
| 97 | 1361 | Joint Legislative Systems Committee | N | Y | $6,597 |
| 98 | 1361 | Kalama, City of | N | Y | $19,663 |
| 99 | 1361 | Kelso School District No. 458 | N | Y | Withdrawn |

| No | Disaster | Applicant Name | Pnp | Elig | Grant Amt |
|---|---|---|---|---|---|
| 100 | 1361 | Kelso, City of | N | Y | $4,807 |
| 101 | 1361 | Kent School District | N | Y | $566,796 |
| 102 | 1361 | Kent, City of | N | Y | $115,269 |
| 103 | 1361 | King County Fire District No. 44 | N | Y | Withdrawn |
| 104 | 1361 | King County Fire District No. 16 | N | Y | Withdrawn |
| 105 | 1361 | King County Hospital District No. 1 | N | Y | Withdrawn |
| 106 | 1361 | King County Housing Authority | N | Y | Withdrawn |
| 107 | 1361 | King County International Airport | N | Y | Withdrawn |
| 108 | 1361 | King County Water District No. 90 | N | Y | $7,123 |
| 109 | 1361 | King, County | N | Y | $6,255,945 |
| 110 | 1361 | Kirkland, City of | N | Y | Withdrawn |
| 111 | 1361 | Kitsap County Fire District No. 12 | N | Y | Withdrawn |
| 112 | 1361 | Kitsap County Fire District No. 7 | N | Y | $2,224 |
| 113 | 1361 | Kitsap Mental Health Services | Y | Y | $6,718 |
| 114 | 1361 | Kitsap, County of | N | Y | $44,427 |
| 115 | 1361 | La Conner School District No. 311 | N | Y | $30,771 |
| 116 | 1361 | Lacey, City of | N | Y | $115,042 |
| 117 | 1361 | Lake Alice Water Association | Y | Y | $33,345 |
| 118 | 1361 | Lake Stevens School District No. 4 | N | Y | $14,683 |
| 119 | 1361 | Lake Stevens Sewer District | N | Y | $95,586 |
| 120 | 1361 | Lake Washington School District | N | Y | Withdrawn |
| 121 | 1361 | Lake Washington Technical College | N | Y | $3,641 |
| 122 | 1361 | Lakewood Fire District | N | Y | $3,446 |
| 123 | 1361 | Lakewood School District No. 306 | N | Y | $15,548 |
| 124 | 1361 | Lakewood Water District | N | Y | $101,031 |
| 125 | 1361 | Lakewood, City of | N | Y | Withdrawn |
| 126 | 1361 | Lewis County Fire District No. 12 | N | Y | $788 |
| 127 | 1361 | Lewis County Fire District No. 14 | N | Y | $784 |
| 128 | 1361 | Lewis County Fire District No. 2 | N | Y | Withdrawn |
| 129 | 1361 | Lewis County Fire District No. 5 | N | Y | $5,276 |
| 130 | 1361 | Lewis County Fire Protection District No. 9 | N | Y | $788 |
| 131 | 1361 | Lewis, County | N | Y | $49,271 |
| 132 | 1361 | Longview, City of | N | Y | Withdrawn |
| 133 | 1361 | Lower Columbia College | N | Y | Withdrawn |
| 134 | 1361 | Lower Elwha Klallam Tribe | N | Y | $2,783 |

| No | Disaster | Applicant Name | Pnp | Elig | Grant Amt |
|---|---|---|---|---|---|
| 135 | 1361 | Lummi Nation | N | Y | $42,807 |
| 136 | 1361 | Lynden Fire Department | N | Y | $19,817 |
| 137 | 1361 | Madrona Beach Water Company, Inc. | Y | Y | $42,043 |
| 138 | 1361 | Makah Tribal Council | N | Y | $11,598 |
| 139 | 1361 | Manchester Water District | N | Y | $44,950 |
| 140 | 1361 | Maple Valley, City of | N | Y | $35,395 |
| 141 | 1361 | Mary M Knight School No. 311 | N | Y | $3,002 |
| 142 | 1361 | Mason , County of | N | Y | $127,535 |
| 143 | 1361 | Mason County Fire District No. 6 | N | Y | $788 |
| 144 | 1361 | Mason County Public Utility District No. 3 | N | Y | $230,502 |
| 145 | 1361 | Mercer Island School District | N | Y | $0 |
| 146 | 1361 | Mercer Island, City of | N | Y | $7,109 |
| 147 | 1361 | Meridian Heights Water District | Y | Y | $7,048 |
| 148 | 1361 | Meridian School District | N | Y | $3,091 |
| 149 | 1361 | Milton, City of | N | Y | $4,762 |
| 150 | 1361 | Morton School District | N | Y | Withdrawn |
| 151 | 1361 | Morton, City of | N | Y | $10,865 |
| 152 | 1361 | Mount Baker School District No. 507 | N | Y | $3,693 |
| 153 | 1361 | Mountlake Terrace, City of | N | Y | $10,192 |
| 154 | 1361 | Mukilteo School District | N | Y | $25,608 |
| 155 | 1361 | Mukilteo, City of | N | Y | $6,017 |
| 156 | 1361 | Museum Development Authority | N | Y | $47,778 |
| 157 | 1361 | Newcastle, City of | N | Y | Withdrawn |
| 158 | 1361 | Nisqually Indian Tribe | N | Y | $131,683 |
| 159 | 1361 | Nooksack, City of | N | Y | $1,460 |
| 160 | 1361 | Normandy Park, City of | N | Y | $835 |
| 161 | 1361 | North Bend, City of | N | Y | $5,384 |
| 162 | 1361 | North Highline Fire District | N | Y | Withdrawn |
| 163 | 1361 | North River School District | N | Y | $8,739 |
| 164 | 1361 | North Seattle Community College | N | Y | $6,244 |
| 165 | 1361 | North Sound Regional Support Network | N | Y | Withdrawn |
| 166 | 1361 | North Thurston School District | N | Y | $90,258 |
| 167 | 1361 | Northshore Utility District | N | Y | $301,483 |
| 168 | 1361 | Northwest Railway Museum | Y | Y | Withdrawn |
| 169 | 1361 | Ocean Shores, City of | N | Y | $8,126 |

| No | Disaster | Applicant Name | Pnp | Elig | Grant Amt |
|----|----------|----------------|-----|------|-----------|
| 170 | 1361 | Odyssey, the Maritime Discovery Center | Y | Y | $15,768 |
| 171 | 1361 | Office of the Attorney General | N | Y | Withdrawn |
| 172 | 1361 | Office of the Governor | N | Y | Withdrawn |
| 173 | 1361 | Office of the Lieutenant Governor | N | Y | $4,705 |
| 174 | 1361 | Office of the Secretary of State | N | Y | $835 |
| 175 | 1361 | Office of the State Treasurer | N | Y | Withdrawn |
| 176 | 1361 | Olympia School District No. 111 | N | Y | $65,753 |
| 177 | 1361 | Olympia, City of | N | Y | $675,740 |
| 178 | 1361 | Olympic College | N | Y | Withdrawn |
| 179 | 1361 | Olympic View Water & Sewer District | N | Y | $0 |
| 180 | 1361 | Onalaska School District No. 300 | N | Y | $8,140 |
| 181 | 1361 | Orting School District No. 344 | N | Y | $2,144 |
| 182 | 1361 | Orting, City of | N | Y | $0 |
| 183 | 1361 | Pacific Hospital Preservation & Dev. Auth | N | Y | $157,980 |
| 184 | 1361 | Pacific, County of | N | Y | $1,819 |
| 185 | 1361 | Pe Ell, City of | N | Y | $8,838 |
| 186 | 1361 | Peninsula College | N | Y | $93,971 |
| 187 | 1361 | Peninsula Community Health Services | Y | Y | Withdrawn |
| 188 | 1361 | Peninsula School District No. 401 | N | Y | Withdrawn |
| 189 | 1361 | Pierce College | N | Y | $58,772 |
| 190 | 1361 | Pierce County Fire District No. 17 | N | Y | $1,479 |
| 191 | 1361 | Pierce County Fire District No. 14 | N | Y | $19,890 |
| 192 | 1361 | Pierce County Fire District No. 18 | N | Y | $23 |
| 193 | 1361 | Pierce County Fire District No. 21 | N | Y | $796 |
| 194 | 1361 | Pierce County Fire District No. 5 | N | Y | Withdrawn |
| 195 | 1361 | Pierce County Fire District No. 20 | N | Y | Withdrawn |
| 196 | 1361 | Pierce County Fire District No. 23 | N | Y | $19,695 |
| 197 | 1361 | Pierce County Regional Support Network | N | Y | $0 |
| 198 | 1361 | Pierce County Rural Library District | N | Y | $74,136 |
| 199 | 1361 | Pierce Transit | N | Y | Withdrawn |
| 200 | 1361 | Pierce, County of | N | Y | $485,304 |
| 201 | 1361 | Pike Place Preservation & Development Auth. | N | Y | $114,888 |
| 202 | 1361 | Pinewood Glen Improvement Club | Y | Y | $2,911 |
| 203 | 1361 | Pioneer Human Services | Y | Y | $163,708 |
| 204 | 1361 | Plymouth Housing Group | Y | Y | $4,190 |

| No | Disaster | Applicant Name | Pnp | Elig | Grant Amt |
|----|----------|----------------|-----|------|-----------|
| 205 | 1361 | Port Angeles, City of | N | Y | $47,894 |
| 206 | 1361 | Port Gamble S'klallam Housing Authority | N | Y | $12,856 |
| 207 | 1361 | Port of Anacortes | N | Y | $41,668 |
| 208 | 1361 | Port of Chehalis | N | Y | $8,398 |
| 209 | 1361 | Port of Everett | N | Y | $48,091 |
| 210 | 1361 | Port of Olympia | N | Y | $98,320 |
| 211 | 1361 | Port of Port Angeles | N | Y | $5,192 |
| 212 | 1361 | Port of Seattle | N | Y | $3,829,612 |
| 213 | 1361 | Port of Tacoma | N | Y | $164,646 |
| 214 | 1361 | Port Orchard, City of | N | Y | $27,478 |
| 215 | 1361 | Providence Health System | Y | Y | $212,543 |
| 216 | 1361 | PUD #1 of Snohomish County | N | Y | $38,401 |
| 217 | 1361 | Puyallup School District | N | Y | $194,400 |
| 218 | 1361 | Puyallup, City of | N | Y | $131,431 |
| 219 | 1361 | Quinault Indian Nation | N | Y | $1,980 |
| 220 | 1361 | Rainier School District No. 307 | N | Y | $350 |
| 221 | 1361 | Rainier, Town of | N | Y | $16,585 |
| 222 | 1361 | Raymond, City of | N | Y | $35,282 |
| 223 | 1361 | Recovery Centers of King County | Y | Y | $2,866 |
| 224 | 1361 | Redmond, City of | N | Y | Withdrawn |
| 225 | 1361 | Renton School District | N | Y | $0 |
| 226 | 1361 | Renton Technical College | N | Y | $35,134 |
| 227 | 1361 | Renton, City of | N | Y | $217,310 |
| 228 | 1361 | Rochester School District 401 | N | Y | $0 |
| 229 | 1361 | Safe Homes | Y | Y | $35,942 |
| 230 | 1361 | Sauk-Suiattle Indian Tribe of Washington | N | Y | $2,940 |
| 231 | 1361 | Seattle-King County Department of Health | N | Y | Withdrawn |
| 232 | 1361 | Seattle Central Community College | N | Y | $39,047 |
| 233 | 1361 | Seattle Chinatown Development Authority | N | Y | $34,704 |
| 234 | 1361 | Seattle Indian Health Board | Y | Y | $48,463 |
| 235 | 1361 | Seattle Indian Services Commission | N | Y | $426,988 |
| 236 | 1361 | Seattle School District No. 1 | N | Y | $1,110,755 |
| 237 | 1361 | Seattle, City of | N | Y | $3,221,569 |
| 238 | 1361 | Sedro Woolley, City of | N | Y | $9,629 |
| 239 | 1361 | Sentencing Guidelines Commission | N | Y | Withdrawn |

| No | Disaster | Applicant Name | Pnp | Elig | Grant Amt |
|----|----------|----------------|-----|------|-----------|
| 240 | 1361 | Shelton School District No. 309 | N | Y | Withdrawn |
| 241 | 1361 | Shelton, City of | N | Y | $8,980 |
| 242 | 1361 | Shoalwater Bay Indian Tribe | N | Y | $1,871 |
| 243 | 1361 | Shoreline Fire Department | N | Y | Withdrawn |
| 244 | 1361 | Shoreline School District | N | Y | $21,536 |
| 245 | 1361 | Silverdale Water District No. 16 | N | Y | $16,152 |
| 246 | 1361 | Skagit, County of | N | Y | Withdrawn |
| 247 | 1361 | Skokomish Indian Tribe | N | Y | $4,396 |
| 248 | 1361 | Snohomish County Emergency Management | N | Y | $4,398 |
| 249 | 1361 | Snohomish County Fire District No. 17 | N | Y | $23,087 |
| 250 | 1361 | Snohomish School District | N | Y | $22,072 |
| 251 | 1361 | Snohomish, City of | N | Y | $12,617 |
| 252 | 1361 | Snohomish, County | N | Y | $74,291 |
| 253 | 1361 | Snoqualmie Valley School District No. 410 | N | Y | $135,794 |
| 254 | 1361 | Snoqualmie, City of | N | Y | $64,405 |
| 255 | 1361 | Sound Transit | N | Y | $569,933 |
| 256 | 1361 | South Bend School District No. 118 | N | Y | $1,505 |
| 257 | 1361 | South Bend, City of | N | Y | $38,377 |
| 258 | 1361 | South Kitsap School District No. 402 | N | Y | $21,130 |
| 259 | 1361 | South Prairie, Town of | N | Y | $957 |
| 260 | 1361 | South Puget Sound Community College | N | Y | $61,128 |
| 261 | 1361 | South Seattle Community College | N | Y | $4,781 |
| 262 | 1361 | Southern Puget Sound Inter-Tribal Housing Auth. | N | Y | $1,529 |
| 263 | 1361 | Southwest Suburban Sewer District | N | Y | $43,149 |
| 264 | 1361 | Squaxin Island Tribe | N | Y | $1,268 |
| 265 | 1361 | State Auditor's Office | N | Y | $1,370 |
| 266 | 1361 | State Department of Financial Institutions | N | Y | Withdrawn |
| 267 | 1361 | State Department of General Administration | N | Y | $8,235,429 |
| 268 | 1361 | Steilacoom Historical School District No. 01 | N | Y | $277,798 |
| 269 | 1361 | Steilacoom, City of | N | Y | $21,859 |
| 270 | 1361 | Sultan, City of | N | Y | $1,449 |
| 271 | 1361 | Sumner School District | N | Y | Withdrawn |
| 272 | 1361 | Sumner, City of | N | Y | $7,943 |
| 273 | 1361 | Suquamish Indian Tribe | N | Y | $10,734 |
| 274 | 1361 | Swedish Health Services | Y | Y | Withdrawn |

| No | Disaster | Applicant Name | Pnp | Elig | Grant Amt |
|----|----------|----------------|-----|------|-----------|
| 275 | 1361 | Swinomish Tribal Community | N | Y | $4,819 |
| 276 | 1361 | Tacoma Community College | N | Y | $138,448 |
| 277 | 1361 | Tacoma Department of Public Utilities | N | Y | Withdrawn |
| 278 | 1361 | Tacoma Metro Parks | N | Y | $5,875 |
| 279 | 1361 | Tacoma School District No. 10 | N | Y | $225,927 |
| 280 | 1361 | Tacoma, City of | N | Y | $87,310 |
| 281 | 1361 | Taholah School District No. 77 | N | Y | $7,825 |
| 282 | 1361 | The Compass Center | Y | Y | $1,649,068 |
| 283 | 1361 | The Low Income Housing Institute | Y | Y | $543,553 |
| 284 | 1361 | Thurston County Fire District No. 3 | N | Y | $4,839 |
| 285 | 1361 | Thurston County Fire District No. 6 | N | Y | Withdrawn |
| 286 | 1361 | Thurston, County | N | Y | $381,389 |
| 287 | 1361 | Timberland Regional Library | N | Y | $6,909 |
| 288 | 1361 | Timberlands Regional Support Network | N | Y | Withdrawn |
| 289 | 1361 | Toledo, City of | N | Y | $1,967 |
| 290 | 1361 | Tukwila, City of | N | Y | $53,076 |
| 291 | 1361 | Tulalip Tribes Housing Authority | N | Y | $7,016 |
| 292 | 1361 | Tulalip Tribes Inc. | N | Y | $3,283 |
| 293 | 1361 | Tumwater School District | N | Y | $80,924 |
| 294 | 1361 | Tumwater, City of | N | Y | $55,628 |
| 295 | 1361 | University of Washington | N | Y | $2,826,851 |
| 296 | 1361 | University Place, City of | N | Y | Withdrawn |
| 297 | 1361 | Valley Water District | N | Y | $59,880 |
| 298 | 1361 | Vashon Island School District | N | Y | $6,738 |
| 299 | 1361 | Vashon Park District | N | Y | $17,267 |
| 300 | 1361 | View Ranch Estates Water Association | Y | Y | $1,286 |
| 301 | 1361 | Virginia Mason Medical Center | Y | Y | $2,831,474 |
| 302 | 1361 | Wash. State Major League Baseball Stadium | N | Y | $0 |
| 303 | 1361 | Washington Department of Health | N | Y | Withdrawn |
| 304 | 1361 | Washington Dept. of Fish & Wildlife | N | Y | $40,657 |
| 305 | 1361 | Washington Dept. of Information Services | N | Y | Withdrawn |
| 306 | 1361 | Washington Dept. of Natural Resources | N | Y | $134,437 |
| 307 | 1361 | Washington Dept. of Transportation | N | Y | $266,563 |
| 308 | 1361 | Washington State Arts Commission | N | Y | Withdrawn |
| 309 | 1361 | Washington State Board of Accountancy | N | Y | Withdrawn |

| No | Disaster | Applicant Name | Pnp | Elig | Grant Amt |
|---|---|---|---|---|---|
| 310 | 1361 | Washington State Code Reviser's Office | N | Y | $0 |
| 311 | 1361 | Washington State Convention & Trade | N | Y | $199,059 |
| 312 | 1361 | Washington State Dept. of Agriculture | N | Y | $6,517 |
| 313 | 1361 | Washington State Dept. of Ecology | N | Y | $21,078 |
| 314 | 1361 | Washington State Dept. of Retirement Systems | N | Y | Withdrawn |
| 315 | 1361 | Washington State Historical Society | N | Y | Withdrawn |
| 316 | 1361 | Washington State House of Representatives | N | Y | $42,946 |
| 317 | 1361 | Washington State Law Library | N | Y | $77,365 |
| 318 | 1361 | Washington State Library | N | Y | $46,931 |
| 319 | 1361 | Washington State Liquor Board | N | Y | $0 |
| 320 | 1361 | Washington State Military Department | N | Y | $2,077,599 |
| 321 | 1361 | Washington State Office of Financial Mgmt. | N | Y | $4,472 |
| 322 | 1361 | Washington State Parks & Recreation | N | Y | $393,085 |
| 323 | 1361 | Washington State Patrol | N | Y | $76,993 |
| 324 | 1361 | Washington State Redistricting Commission | N | Y | Withdrawn |
| 325 | 1361 | Washington State Senate | N | Y | $8,046 |
| 326 | 1361 | Westport, City of | N | Y | $2,386 |
| 327 | 1361 | Whatcom, County of | N | Y | $8,197 |
| 328 | 1361 | White Pass School District | N | Y | $11,112 |
| 329 | 1361 | White River School District No. 416 | N | Y | Withdrawn |
| 330 | 1361 | Wilkeson, City of | N | Y | $66,081 |
| 331 | 1361 | Winlock, City of | N | Y | $17,139 |
| 332 | 1361 | Woodinville Water District | N | Y | $13,572 |
| 333 | 1361 | Woodinville, City of | N | Y | $23,782 |
| 334 | 1361 | Yelm Community Schools District No. 2 | N | Y | $2,553 |
| 335 | 1361 | Yelm, City of | N | Y | Withdrawn |
| 336 | 1361 | YMCA of Greater Seattle | Y | Y | $0 |